IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ALLFIRST BANK                          *

   Plaintiff and                   *
   Counter-Defendant
                                   *

        vs.                  *    CIVIL ACTION NO. MJG-01-2527
                          (Consolidated with MJG-01-2991)
                                   *

PROGRESS RAIL SERVICES                 *
CORPORATION, et al.
                                   *

   Defendants and
   Counter-Plaintiffs              *

*    *    *    *    *    *    *    *    *    *    *    *    *

MEMORANDUM OF DECISION

     This case has been tried before the Court without a jury.
The Court has heard the evidence, reviewed the exhibits,
considered the materials submitted by the Parties, and has had
the benefit of the arguments of counsel.  The Court has made its
factual findings based upon its evaluation of the evidence and
the reasonable inferences drawn therefrom.

     The Court now issues this Memorandum of Decision as its
findings of fact and conclusions of law in compliance with Rule
52(a) of the Federal Rules of Civil Procedure.

I.    INTRODUCTION

     As discussed herein, a commercial bank entered into a
transaction whereby it in substance (but not in form) lent some

$13 million to two related corporations engaged in the railroad car leasing business. The "loan" was to be repaid with "interest" (profit) from the proceeds of rent paid by railroads for the use of the railcars. The transaction was structured as a sale so that the "borrowers" were able to book a gain of some $6,000,000 and remove the depreciated railcars from their balance sheet inventory.

The transaction did not proceed as planned and was an economic disappointment primarily because the railcars were not in as good a condition as expected and there was a decrease in the demand for the railcars.

The parties have been unable to sort out the multitude of issues presented in connection with their complex transaction. Accordingly, it has been necessary for the Court to resolve the issues presented by a decision to be "translated" into a bottom line result through a computational process.

II.  BACKGROUND

Plaintiff, Allfirst Bank1 ("Allfirst") was, at all times pertinent hereto, a commercial bank. Allfirst, among other

_____

[1]  Reference to "Allfirst" herein is intended to include any predecessor or successor in interest to Allfirst Bank in regard to the transaction at issue. To be precise, the transaction was entered into by The First National Bank of Maryland ("FM" as referenced in the Portfolio Transaction documents), a predecessor in interest to Allfirst Bank. In 2003, Allfirst merged into M&T Bank.

things, engaged in various financing transactions involving railroad cars ("railcars"). At all times pertinent hereto, Defendants Progress Rail Services Corporation ("Progress") and its wholly owned subsidiary, Railcar Ltd. ("Railcar") were in the business of leasing, repairing and managing railcars. For approximately ten years prior to 1998, Allfirst had engaged in transactions involving leased railcars with Defendants.

On November 30, 1998, the Parties entered into the transaction at issue. Referred to as the "Portfolio Transaction." The Portfolio Transaction was memorialized in three documents:

1) The Assignment Agreement (Allfirst, Progress and Railcar)

2) The Service Agreement (Allfirst and Progress)

3) The Guarantee (the "First Loss Deficiency Guaranty" or "FLDG") (Allfirst and Progress)

In substance, the Portfolio Transaction was an equipment lease financing transaction in which Allfirst "lent" Defendants some $13 million with the expectation that the leased railcars would earn rental income to repay the "loan" over the term of the transaction with a 7.26% profit. (Pl.'s Trial Ex. 7 at A2558; Trial Tr. 52:12-16, May 20, 2003.) However, the transaction was structured as a sale of the railcars so that Progress could book a gain of some $6,000,000 and remove the railcars from its balance sheet. (Martini Dep. 40:15-41:6, Aug.

3

14, 2002).  Thus, pursuant to the terms of the Portfolio

Transaction:

1) Progress and Railcar transferred ownership to Allfirst of 996[2] used railcars subject to leases to various railroads.

2) Allfirst paid $13,220,351 to Allfirst and Progress.

3) Progress and Railcar undertook to collect rent due under the leases, make certain payments to Allfirst, maintain and repair the railcars and, when the lease on a railcar expired, to attempt to re-lease or sell the railcar.

4) Progress provided Allfirst a limited guaranty by means of which Progress bore Allfirst's risk of loss from a failure to re-lease cars to the extent of almost 10%[3] of the sale price plus interest.

The Portfolio Transaction did not work out as planned for

various reasons. These included Defendants' inability to re-

lease the railcars to the extent expected due to market

conditions[4] and the poor condition of many of the railcars in the

transaction.  The parties engaged in various efforts to minimize

their losses, including some informal variations from the terms

_____

[2]   The actual number of cars varied from 996.  Some of the cars included in the Portfolio Transaction were like kind exchanged, or were nonexistent at the time of purchase.

[3]   Less than 10% to enable accounting treatment of the transaction as a sale.

[4]   Defendants presented evidence at trial that a decline in the market for open-top hoppers designed to move Eastern coal resulted due to the simultaneous impact of a general economic downturn, rail service improvements that led to decreased need for such railroad cars, and environmental rules that increased demand for coal with a lower sulfur content.  (Trial Tr. 292:6-293:4).

of the Portfolio Transaction.  Nevertheless, the transaction was

unsuccessful, the parties were unable to resolve their

differences as to how to untangle themselves and ended up in the

instant lawsuit.[5]


III.  <u>LEGAL PRINCIPLES</u>

    A.  <u>Contract Interpretation</u>

    "The principal rule in interpretation of contracts is to

effect the intentions of the parties."  <u>Nicholson Air Servs.,</u>

<u>Inc. v. Bd. of County Comm'rs of Allegany County</u>, 120 Md. App.

47, 63, 706 A.2d 124, 132 (1998) (internal citations omitted).

The intent of the parties "must be garnered from the terms [of

the agreement] considered as a whole, and not from the clauses

considered separately."  <u>Laurel Race Course, Inc. v. Regal</u>

<u>Const. Co.</u>, 274 Md. 142, 153, 333 A.2d 319, 327 (Md. 1975).

However, when facing a potentially ambiguous term, the court may

"consider the character of the contract, its object and purpose,

---

[5]    The litigation began with a civil lawsuit filed by Progress
and Railcar against Allfirst in the Superior Court of Fulton
County, Georgia, seeking declaratory judgment and injunctive
relief.  Allfirst removed the action to the United States
District Court for the Northern District of Georgia.  Allfirst
then sued Defendants in this court (Case No. H-01-2527) seeking
damages for breach of contract as well as specific performance
of the contract. Defendants counter-claimed for declaratory
judgment, injunctive relief and monetary relief.

    Thereafter, The Georgia case was transferred to this
District (Case No. H-01-2991).  Judge Harvey consolidated the
cases.  Thereafter, Judge Harvey recused himself and the cases
were reassigned to the undersigned judge.

and the facts and circumstances surrounding the parties at the time of its execution . . . ." State Farm Fire & Cas. Co. v. Quirt, 28 Md. App. 603, 611, 346 A.2d 497, 502 (1975); see also Calomiris v. Woods, 353 Md. 425, 436, 727 A.2d 358, 363 (1999) ("Thus, while evidence of prior intentions and negotiations of the parties is inadmissible, the parol evidence rule would not bar a court from considering the context of the transaction or the custom of the trade in a determination of ambiguity."). Such considerations avoid interpreting the contract language "in a manner that is void of a commonsensical perspective." Fister ex rel. Estate of Fisher v. Allstate Life Ins. Co., 366 Md. 201, 219, 783 A.2d 194, 205 (2001).

When the court determines that contract language is ambiguous, the ambiguity must be resolved as a question of fact. Nicholson, 120 Md. App. at 63, 706 A.2d at 132. In that endeavor, a court may consider extrinsic and parol evidence to ascertain what the parties intended as the meaning of the term. See Bushey v. N. Assurance Co. of Am., 362 Md. 626, 632, 766 A.2d 598, 601 (2001). The extrinsic evidence includes, but is not limited to, "sources such as dictionaries or an interpretation of the term employed by one of the parties before the dispute arose." Fister, 366 Md. at 216, 783 A.2d at 203 (internal citations omitted).

## B.   Prejudgment Interest

Under Maryland law, the matter of prejudgment interest normally is left to the discretion of the jury, or the trial court when sitting without a jury.  See I.W. Berman Properties v. Porter Bros., Inc., 276 Md. 1, 18-19, 344 A.2d 65, 75 (1975). Prejudgment interest is recoverable as a matter of right where the money claimed has actually been used by the other party. Travel Committee, Inc. v. Pan American World Airways, Inc., 91 Md. App. 123, 188, 603 A.2d 1301, 1333 (1992).

The rate of prejudgment interest is beyond debate.  As stated in First Virginia Bank v. Settles, 322 Md. 555, 566, 588 A.2d 803, 808 (1991), "prejudgment interest which is awarded should be at the rate of 6% per annum."  See also Travel Committee, 603 A.2d at 1333-34.

In this decision, the Court shall address the matter of prejudgment interest on an item by item basis and shall, when appropriate, award prejudgment interest to the prevailing party at the rate of 6% per annum.

## IV.   THE PORTFOLIO TRANSACTION DOCUMENTS

As noted above, the Portfolio Transaction documents consisted of:

  1) The Assignment Agreement

  2) The Service Agreement

  3) The Guaranty ("FLDG")

7

A. The Assignment Agreement and Guarantee (FLDG)

The Assignment Agreement provided for Progress and Railcar to sell 996 railcars to Allfirst and assign the lessors' rights in the leases to which they were subject. (Pl.'s Trial Ex. 1 at A0528). Allfirst assumed the responsibilities of the lessor with the exception of maintenance and repair obligations that were assumed by Progress.[6] The Assignment Agreement also obligated Progress to enter into the Service Agreement and the FLDG.

The Assignment Agreement identified the assigned leases and specified the lease types, the number of cars included in each lease, the lease ending dates, and the lease's monthly rent. (Pl.'s Trial Ex. 1 at A0546).[7] November 30, 2001, was set as the end date for the "Minimum Lease Term" for each lease. A "Minimum Net Rent" ("MNR") that Progress was obligated to obtain for each lease over the "Minimum Lease Term" was also specified.[8]

---

[6] Banking regulations prohibit national banks from assuming responsibility for repair and maintenance of purchased assets. See 12 CFR § 225.28(b)(3)(i) n.5.

[7] See also Compl. Ex. 5 (Am. Ex. II).

[8] All of the assigned leases ended before the "Minimum Lease Term."

Based on these factors, the parties arrived at the purchase price.[9]

The heart of the Assignment Agreement was contained in Section 6. This Section covered the administration of the assigned leases and Defendants' duties at the expiration of, or a default on, an assigned lease. Pursuant to Section 6, Defendants became Allfirst's agent in administering the assigned leases, negotiating renewal or replacement leases and selling the railcars. Each Defendant was required to "operate [the railcars] in the same manner as it operates with respect to its own assets" and to obtain Allfirst's approval of any new railcar lease or sale. (Pl.'s Trial Ex. 1 at A0529). Defendants preferred this arrangement because, at the end of the transaction, Progress expected to repurchase the cars for use in its scrap business.[10]

As Allfirst's agents, Defendants were required to remit to Allfirst all car revenues, including rental payments, casualty payments and proceeds from sales. (Pl.'s Trial Ex. 1 at A0529 § 6.1). If a lessee failed to pay rent on time or in full,

---

[9]    The purchase price was calculated per lease based on the amount Allfirst expected to receive in rent over the "Minimum Lease Term" plus an estimate of the cars' residual value at the end of the financing.

[10]   Allfirst provided Defendants with a fixed purchase price option to buy all the cars when the agreement ended. (Pl.'s Trial Ex. 1 at A0531 § 9.1).

Progress was obligated to make up the difference and promptly remit the full rental amount to Allfirst. (Pl.'s Trial Ex. 1 at A0529 § 6.1). If a lessee failed to pay rent in full within 60 days, Progress, was permitted, in the following order, to: (1) claim a reimbursement;[11] (2) reduce the FLDG limit to the extent the claim exceeded the funds then available to Progress from the Deficiency Reserve Account; or (3) demand a refund of the advanced rent from Allfirst if the claim exceeded the FLDG limit. (Pl.'s Trial Ex. 1 at A0530 § 6.1.2). If Progress exercised the second option and reduced the FLDG limit, it was required to notify Allfirst in writing, within 30 days of taking such action.

The Assignment Agreement required Progress to enter into the Service Agreement and execute and deliver the FLDG to Allfirst. (Pl.'s Trial Ex. 1 at A0531 §§ 7, 8). Any losses incurred by Progress related to the Service Agreement would neither be credited against the FLDG nor reimbursed from the reserve account. (Pl.'s Trial Ex. 1 at A0531 § 7). The parties were to discuss any railcar repairs required outside of those outlined in the Service Agreement and determine how those

---

[11]     From the Deficiency Reserve Account discussed _infra_.

repairs would alter the Portfolio Transaction.12  (Pl.'s Trial
Ex. 1 at A0531 § 7).

The Assignment Agreement also specified the priority for
applying collected rental payments to the parties' various
accounts.  First, payments would be applied to Allfirst to
satisfy Minimum Net Monthly Rentals, and then any surplus would
go to Progress for service fees, with any remainder to a joint
Deficiency Reserve Account ("the Reserve" or "the DRA").  The
Reserve was created to make up for any subsequent shortfalls in
rental payments.  At the expiration of the Assignment Agreement,
any remaining funds in the DRA would be paid out to the Parties,
with 75% apportioned to Allfirst and 25% to Defendants.  (Pl.'s
Trial Ex. 1 at A0532-33 § 11).

---

12    Section 7 of the Assignment Agreement states in pertinent
part:

> If any repairs are required to be made to the Cars in
> addition to those provided in Paragraph 1 of the
> Service Agreement, [Allfirst] and Sellers shall
> discuss those repairs and whether they should be made
> and if made any changes that would then be made to the
> First Loss Deficiency Guarantee, the Minimum Lease
> Term, the Minimum Net Monthly Rentals, the Purchase
> Option, and the Stipulated Loss Value.  The parties
> agree to negotiate any such changes in good faith but
> none of the parties shall be obligated to agree to any
> such changes.

(Pl.'s Trial Ex. 1 at A0531 (emphasis added)).

B.  The Service Agreement

Pursuant to the Assignment Agreement, Allfirst and Progress entered into the Service Agreement effective November 30, 1998, with a five year term ending November 30, 2003.  (Pl.'s Trial Ex. 1 at A1070, A1075).  The Service Agreement required Progress to maintain the cars in interchange condition,[13] and "in a condition to allow the Cars to be leased at the Minimum Net Monthly Rental."[14]  (Pl.'s Trial Ex. 1 at A0599 § 1).  Only after Allfirst received the Minimum Net Rent was Progress entitled to

---

[13]  According to Association of American Railroads rules for operating a railcar on a railroad.

[14]  However, in correspondence to the Court dated January 5, 2009, Allfirst states its position is:

> that Progress Rail merely had to keep the cars <u>in an operable condition that would enable them to go out on lease and earn whatever rent might be available</u>.  If the available rent was less than the Minimum Net Rent, the shortfall was Allfirst's risk, subject to the backstop of the [FLDG]. If the cars had to be placed in a better condition than they were at the inception of the transaction to earn the Minimum Net Rent, Progress Rail was not obligated to better or improve the rail cars beyond what they were when the transaction closed, which was simply to function and be able to be leased, at whatever rent was available even if less than the Minimum Net Rent.

(Gebhardt Ltr., Jan. 5, 3009 [Document 82](emphasis added); Hr'g Tr. 7:8-11, Oct. 21, 2004).

any surplus to satisfy its servicing costs. (Pl.'s Trial Ex. 1 at A0599 § 7).15

Progress was required to make all repairs throughout the lease term unless the lessee had assumed repair obligations. (Pl.'s Trial Ex. 1 at A0599 § 7). Even if a lessee had assumed repair obligations, Progress was still responsible for enforcing the lessee's repair duty and ensuring that the cars were kept in operating condition during the lease term. If a lessee failed to perform its repair obligations, Progress was required to remedy the condition. (Pl.'s Trial Ex. 1 at A0599 § 7).

Progress was entitled to service payments for each lease "for so long as the Lease[16] remains in effect (or until all of the Cars are returned as provided in the Lease, whichever is later)" and "on a limited recourse basis solely from Gross Rentals generated by the Cars" with respect to each car covered by each lease. (Pl.'s Trial Ex. 1 at A0600-01; A0606). The Service Agreement did not specify service fees for renewal or replacement leases.

---

[15] Exhibit A lists the amount to which Progress was entitled for servicing per car per month under each of the assigned leases. (Pl.'s Trial Ex. 1 at A0606).

[16] The Assignment Agreement defined "Leases" as "the leases to which the Cars are subject, as indicated in Exhibit I attached hereto." (Pl.'s Tr. Ex. 1 at A0528). Exhibit I listed the assigned leases. ((Compl., Ex. 5 (Am. Ex. II)).

V.  DETERMINATION OF ISSUES

The Court finds that the Portfolio Transaction contract
between the parties, as a whole, consisted of the written
Assignment Agreement, Service Agreement, the Guarantee ("FLDG")
and the parties' modifications (orally and by conduct, including
acquiescence to variations).

Neither side was in full compliance with all of the terms
of the Portfolio Transaction contract.  The determination of the
bottom line question of which side owes recompense to the other,
and the amount of such recompense, requires resolution of
various disputes and a computation based upon application of the
Court's decision.

The various issues are addressed in turn.


A.  Application of Collected Rents

Section 10 of the Assignment Agreement provides:

> Application of Revenues. [Allfirst] shall apply
> all collected rental payments in respect of the
> Cars (whether in the form of fixed monthly
> rentals, car hire, charges for excess usage, or
> any similar payments of any kind in respect of
> the Cars; and whether collected by Seller and
> paid by Seller to [Allfirst], or advanced by PRSC
> [Progress] to [Allfirst] pursuant to Section 6.1,
> or collected directly by [Allfirst]) as follows
> (which application shall be made on a cumulative
> basis, without interest, such that any
> outstanding amounts due but not paid for any
> previous periods shall be satisfied before the
> application to the next order of priority);

(a) First, to [Allfirst] for payment of the Minimum Net Monthly Rentals.

(b) Second, to PRSC [Progress] for payment of the Service Fees.

(c) Third, to the Deficiency Reserve Account.

(Pl.'s Trial Ex. 1 at A0532.)

The Assignment Agreement called for all railcar rents to be paid to Allfirst, either directly by the lessees or, if paid to Defendants, paid over to Allfirst. As stated in Section 6 of the Assignment Agreement, "[Defendants] shall act as [Allfirst's] agent . . . to collect . . . all rentals." And, in Section 6.1, "[Defendants] shall promptly remit to [Allfirst] all revenues collected by [Defendants] in respect of the [railcars, including gross rentals]." Upon receipt of the gross rental payments, Allfirst was to apply the receipts in the order set forth in Section 10.

Over the course of the transaction, Defendants did not comply with Section 10. In lieu of paying Allfirst all rents collected each month, Defendants paid Allfirst an amount they assert was the total Minimum Net Rent ("MNR")[17] due on all leases whether the actual collections were more, or less, than the total MNR for the month. Defendants, therefore, kept the excess of the total rent collected over MNR for the month, or

_____

[17] Defendants assert that they, in fact, paid the total MNR due each month. If this is not correct, the matter will effectively "wash out" in the course of the computation set forth herein.

paid Allfirst from their funds the difference between total rent collected and the MNR.

It is necessary to determine whether, over the entirety of the Portfolio Transaction, Allfirst received more or less than it would have received had Defendants complied with Section 10.

Under Section 10, which requires a cumulative application of rent received, Allfirst should end up with the full amount of MNR due, Defendants should end up with Service Fees paid to the extent that total rent collections exceeded the total MNR and any excess of total rental collections over total MNR and total Service Fees would be split with 75% going to Allfirst and 25% going to Defendants.

The computation to determine liability with regard to rent collections is done as follows:

- Determine the totals of rents collected from the railroads by Defendants,[18] payments made to Allfirst by Defendants, MNR[19] and Service Fees.

- Determine whether the total MNR is more or less than the total payments made to Allfirst by Defendants.

  o If MNR is greater, Allfirst is entitled to recover the amount of "Underpayment" from Defendants.

---

[18]    Including in the total the additional $50,600 that the Court finds should have been collected in regard to the International Paper Lease.  See infra Section D.4.

[19]    Including in the total the additional $31,300 of MNR that the Court finds should have been paid in regard to the International Paper Lease.  See infra Section D.4.

o   If the total payments are greater than total MNR, then
     there was an "Overpayment," see below.

• If the total rent collected from the railroads by
  Defendants is greater than the total MNR, there was an
  "Overcollection." If so:

    o   Subtract total Service Fees from the Overcollection to
        determine any "Net Overage"

    o   Allfirst is entitled to recover from Defendants 75% of
        any Net Overage[20] less 75% of any Overcollection.[21]

Thus, the bottom line is that Allfirst will end up with the

total MNR it was entitled to be paid, Defendants will end up

having been paid for the Service Fees that should have been paid

by the excess of collections over MNR and any amount that should

have been paid to the Reserve will be effectively divided

between the parties pursuant to the agreed 75%-25% split.

     Section 10 provides that the monthly reckonings are to be

made without interest.  The Court interprets this to mean that

there is no interest taken into account during the MNR term.

However, prejudgment interest is appropriate with regard to the

net result and shall be awarded with regard to the bottom line

net amount determined to be due from November 30, 2001.

---

[20]    This amount should have been paid to the DRA and,
ultimately divided 75%-25%.

[21]    That is, any excess of total MNR over total rent
collections.

B.  Repair Obligations

Paragraph 1 of the Service Agreement provides:

[Progress] shall be responsible to maintain the
[railcars] in a condition to allow the [railcars] to
be leased at the Minimum Monthly Rental.

(Pl.'s Trial Ex. 1 at A1070.)

The duty of Progress to maintain the railcars continued
even after the leases expired.[22]  The extent of Progress's repair
obligations was to "maintain the railcars in a condition to
allow the Cars to be leased at the Minimum Net Monthly Rental."
(Pl.'s Trial Ex. 1 at A0599 § 1).  The dictionary definition of
"maintain" is "to keep in an existing state (as of repair,
efficiency, or validity): preserve from failure or decline."

---

[22]  Defendants initially argued that Progress's repair
obligations ended when the assigned leases expired.  In support
of their position, Defendants relied on the definition of
"Lease" in the Assignment Agreement, which referred only to the
assigned leases.  This definition also applied to the Service
Agreement.  Thus, Defendants argued, Progress's duty to repair
ended once a "Lease" terminated, i.e., at the expiration of the
assigned leases.  According to Defendants, the burden of
maintenance and repair was on Allfirst for the balance of the
Portfolio Transaction term.

In contrast, Allfirst argued that Progress's repair
obligations ran throughout the transaction's five-year term.
Allfirst contended that Defendants' position overlooked Section
1 of the Service Agreement, which stated that Progress's repair
obligations continued until the end of the "Leases," "except as
may otherwise be provided in this Agreement."  Allfirst argued
that this exception clause referred to Section 8 of the Service
Agreement.  Section 8 provides that after a Lease is terminated,
Progress has no further service obligations, except for those
provided in Sections 1(iii), (iv) and (v), which relate to
maintaining the cars in an operable and rentable condition.

See Merriam Webster Online Dictionary, www.m-w.com (last visited Apr. 22, 2009).

The Court finds that Progress was obligated to keep the railcars in the same condition in which they had been at the transaction's inception.

This definition of "maintain" is utilized in connection with Section 7 of the Assignment Agreement because the Parties agreed to discuss any future repair[23] work and mutually decide whether such work should be completed and, if completed, what effect it would have on the FLDG, Minimum Lease Term, Minimum Monthly Rentals, the Purchase Option and the SLV.

The Court finds that following the expiration of an assigned lease, Progress was obligated to maintain the railcars in the condition that they had been when the transaction consummated. Thus, using a hypothetical point grading scale with a brand new car graded at 100 points, if a car were in a hypothetical 65 point condition at the beginning of the transaction, Progress was obligated to keep the car in a 65 point condition at all times when the car was off-lease during the five-year term of the transaction. If, after the expiration of the initial lease, the market would not lease a car with a

---

[23]    The term "repair" was intended to refer to upgrades and improvements to the railcars, essentially repairs in excess of those required to meet interchange condition or hold a load. (Trial Tr. at 97:3-99:10, 239:15-240:11).

grade less than 85 points, Progress was not required to bring the car up from a 65 to an 85 point condition.

While the Parties may dispute the exact condition of each of the railcars, there is no dispute that all of the railcars were on-lease and earning rent when the transaction commenced. Thus, at a minimum, the railcars were in running order and could hold product. At the very least, Progress was obligated to maintain the railcars in this condition.

Progress did not keep all railcars coming off lease in the requisite condition. Thus, Allfirst may be entitled to damages caused by this breach of the agreement.

To establish a right to damages with regard to a failure to maintain a given railcar, Allfirst must establish that it suffered a loss due to the failure. Thus, there would be no damages for a failure to maintain a railcar if the railcar would not have been leased (or otherwise generated funds for Allfirst) had it been maintained.

C. The Railcars

The Portfolio Transaction between Allfirst and Defendants involved approximately 1,000 cars: open-top hoppers, ballast cars, gondolas, and boxcars. Allfirst and Defendants stipulated to the disposition of 483 railcars that had not been sold or disposed of as of the close of evidence on May 30, 2003. Thus, there are issues, sometimes more than one issue per car, that

relate to the disposition of the other cars.  The Court's

findings as to these issues are discussed herein.

### 1.    The 460 Open-Top Hoppers

The Portfolio Transaction included 460 H-350 open-top

hoppers ("OTHs"), 60 on lease to the Texas Mexican Railroad

("Tex-Mex") and the other 400 on lease to CSX and Norfolk

Southern ("CSX/NS").

### a.    The 60 Tex-Mex Open Top Hoppers

The Portfolio Transaction included 60 open top hoppers

("OTHs") on a net lease to Tex-Mex through June 30, 2001.  In

June 2000, however, Tex-Mex contacted Railcar[24] and asked to be

released from the lease because the railcars could no longer

hold product.  (Trial Tr. 265:11-21).  Under the lease terms,

Tex-Mex was responsible for making repairs to the railcars,

regardless of the expense, in order to keep the railcars

operable.  Progress, under the Service Agreement, was obligated

to compel Tex-Mex to make the repairs or assume responsibility

for the repairs itself.  In addition, the Assignment Agreement

obligated Progress to assume Tex-Mex's rental payments for the

remainder of the Minimum Lease Term if Tex-Mex defaulted.

---

[24]    While Railcar was not a party to the Service Agreement or
the FLDG, the Portfolio Transaction was a Railcar endeavor and
Railcar employees continued to manage the deal and address any
issues that arose in connection therewith.

Because of a longstanding relationship with Tex-Mex's parent company, Railcar wished to accommodate Tex-Mex and chose not to enforce the lease. (Trial Tr. at 266:1-6). Railcar sought Allfirst's permission to terminate the lease early. On June 6, 2000, Christopher Pistell ("Pistell") of Allfirst sent an e-mail to Gary Tapp ("Tapp"), then CFO of Railcar, stating that he was "amenable to the proposal that the [Tex-Mex] lease be terminated and that Allfirst be paid the SLV on the cars ($582,303.28 as of 6/30/00) . . . provided that there is no reduction in the FLDG." (Pl.'s Trial Ex. 41; Trial Tr. 267:1-268:13). Tapp did not express disagreement with this statement, and Railcar sent SLV payments to Allfirst until all cars were removed from the transaction. (Defs.' Trial Ex. 600(c)). At trial, counsel for Defendants reiterated that, although the Portfolio Transaction would be reduced by 60 railcars, no reduction in the FLDG limit would occur. (Def. Trial Ex. 600(c) at 268:16-19) ("We [Defendants] are not making any claim against the FLDG for these 60 Tex Mex cars, that is not part of the case.").

This Court finds that the Parties agreed to remove the 60 Tex-Mex OTHs from the transaction upon payment of the SLV to Allfirst without adjustment to the FLDG limit. The payment was made and these railcars are not at issue.

b. The 400 CSX and Norfolk Southern Open-Top
Hoppers

The Portfolio Transaction included 400 OTHs on leases with CSX and Norfolk Southern ("NS") that expired at various times in 1999. (Pl.'s Trial Ex. 1 at A0546). Of these 400 OTHs, 165 were included in the Joint Stipulation [Document 74]. As the leases ended, it became apparent that the cars would require extensive repairs in order to be leased again. (Trial Tr. 249:8-252:12). In many cases, the potential repair costs exceeded what the railcars could earn in rent. In terms of marketing, Railcar also realized that leasing these railcars again would be difficult, regardless of their condition, because the demand for OTHs was declining. (Trial Tr. at 290:18-294:8). As a result, when the leases ended, Railcar "parked" or stored most of Allfirst's cars. (Trial Tr. at 291:3-19). Railcar continued to remit the monthly MNR to Allfirst for these railcars, but did not inform Allfirst that most of the OTHs were sitting idle.

On February 10, 2000, Allfirst and Railcar held a meeting at Railcar's Atlanta offices to discuss a number of financing transactions, including the Portfolio Transaction (hereinafter the "February 10 meeting"). Present at the meeting were Eugene Martini ("Martini") and Tapp of Railcar, and Mitchell Crook

("Crook") and Pistell of Allfirst.[25]  At the meeting, Martini

explained that 400 OTHs about to come off-lease were in much

worse condition than anyone had expected.  (Trial Tr. 249:11-17;

251:6-15).  Martini explained that he was not sure whether the

cars would even last for the agreed-upon minimum three-year

term.  (Trial Tr. at 251:16-23).  Because the cars were in such

bad shape, the repair costs would exceed the cars' rental value.

To remedy this, Martini offered to pay Allfirst the SLV for each

car when it was returned to the yard, scrap the cars and remove

them from the transaction.  (Trial Tr. 251:1-5).  Martini said

that Railcar would absorb the attendant losses.  (Trial Tr. at

251:13-23).  There was no mention of the possibility that the

declining market for OTHs was the reason for the removal;

rather, the parties discussed the potential for putting out on

new leases cars that were in operable condition.  (Trial Tr. at

259:6-16).  At the end of the meeting, Crook told Martini,

"thanks for not making your problem our problem."  (Trial Tr.

297:4-5).

The oral agreement made at the February 10 meeting was

never reduced to writing, nor was the issue addressed as to

whether the parties would adjust the FLDG to reflect removal of

cars from the transaction.  (Trial Tr. at 255:21-259:5).

However, in the months following the meeting, Railcar began

---

[25]    Other Railcar employees and agents for Progress and Railcar
were present at various times during the meeting.

scrapping OTHs as the leases ended. Typically, when a lease ended and the car was returned to the yard, Railcar sent the applicable SLV to Allfirst and sent the car to Progress for scrapping, and then Progress remitted the scrap payment to Railcar. (Trial Tr. 252:18-22; 253:20-23). The average scrap price was less than half of the car's SLV, and Railcar absorbed this loss on its books. Allfirst received the SLV for the scrapped car, but did not receive details of either the scrapping or the scrap prices paid to Railcar. During this period, Railcar never notified Allfirst of any intent to apply these losses to reduce the FDLG limit pursuant to the Guaranty.

On June 6, 2000, in connection with the Tex-Mex agreement discussed supra, Pistell noted in an email to Tapp that the Tex-Mex arrangement to pay the SLV on cars removed from the transaction without a corresponding reduction of the FLDG "would be consistent with how Railcar Ltd is paying Allfirst on the other (NS and CSX) cars, where the condition of the cars was far worse than either Allfirst or Railcar anticipated." (Pl.'s Trial Ex. 41).

Defendants did not raise an issue about any FLDG limit reduction until Martini was set to retire in early 2001, almost a year after the February 10 meeting. During a meeting on January 25, 2001, prompted by the end of Martini's tenure as Railcar's CEO, the Parties felt it wise to discuss certain

issues before new management took over Railcar. At that meeting, Jeff Edelman ("Edelman") of Railcar told Pistell that the FLDG amount should be reduced pro rata to account for the 460 OTH (Tex-Mex, NS and CSX) taken out of the deal. (Trial Tr. 2268:1-2269:15). Pistell did not voice disagreement, even though he had previously indicated in the e-mail to Tapp that the FLDG was not to be affected by the agreements. (Trial Tr. 2268:1-2269:15). Following the meeting, Edelman e-mailed a spreadsheet to Pistell showing the amount being reduced from the FLDG as of November 1998, and Pistell responded that the calculation appeared correct except for the fact that Edelman used an FLDG percentage of 9.95% instead of 9.995%.[26] (Trial Tr. at 2273:24-2275:18). Pistell also indicated, however, that he would have to discuss the matter with Crook. (Defs.' Trial Ex. 318).

In the spring of 2001, Crook and Railcar's new CEO, Jim Smallwood ("Smallwood"), began discussing the February 10 meeting and the FLDG amount. Smallwood took the position that the three written agreements of the Portfolio Transaction controlled the transaction, and any oral agreements made by Martini at the February 10 meeting were unenforceable. Smallwood reasoned that, under his interpretation of the

---

[26] The Court notes that it appears Pistell used the FLDG percentage as both the FLDG percentage and the accretion rate. According to the FLDG, the accretion rate is 9.5%.

Portfolio Transaction, each SLV payment for the scrapped OTHs reduced the FLDG amount by the difference between the SLV amount and the scrap amount. As a result, Railcar argued it had overpaid and was entitled to a $1.6 million refund. Allfirst disagreed and took the position that, as of the February 10 meeting, a verbal agreement existed under which Railcar would pay the SLV to Allfirst and absorb the losses with no reduction in the FLDG amount. In an effort to resolve the dispute, Allfirst offered to reduce the FLDG amount pro rata to reflect the fact that the OTHs were taken out of the transaction. Smallwood rejected this offer. The dispute has been presented to the Court for resolution

In this case, Allfirst contends that:

1)   The Parties reached an oral agreement to remove the
     OTHs from the Portfolio Transaction and both Parties
     understood that no reduction in the FLDG amount would
     result.

2)   Under the Service Agreement, Allfirst could have
     forced Progress to repair the OTHs, but agreed to
     remove the cars in an effort to accommodate Progress.

Progress contends that:

1)   Martini's offer to take the 400 OTHs out of the deal
     assumed that the FLDG limit would be reduced pro rata
     to account for the reduced number of cars in the
     transaction.

2)   It was to Allfirst's benefit to accept the offer
     because the market for OTHs had collapsed and the cars
     would have been unable to earn rent.

3) Because there was no oral agreement, there must be a reduction of the FLDG limit by the difference between the SLV paid Allfirst and the scrap price.

The Court finds that the parties agreed, by word and conduct[27] that as the CSX/NS OTHs came off their initial leases, Railcar was permitted, but not required, to pay Allfirst the SLV for each car and thereafter scrap the cars and remove them from the transaction. The Parties did not agree simply to remove all 400 CSX/NS OTHs from the transaction but instead agreed that Railcar was permitted, at its discretion, to remove the OTHs from the transaction on a car-by-car basis as the cars came off lease. Thus, Railcar could scrap a car and eliminate any continuing obligation with regard to it. However, if Railcar chose not to scrap the car, then the car remained in the Portfolio Transaction. In that case, as with other non-OTH cars in the transaction, Defendants were obligated, inter alia, to attempt to re-lease the car and Progress was obligated to maintain the car and pay the MNR as provided in the Assignment Agreement.

The Court further finds that the parties agreed that there was to be no reduction of the FLDG limit when Railcar chose to

---

[27] Not only did Martini and Crook reach such an agreement at the February 10 meeting, but the parties' subsequent actions were consistent with this agreement. Railcar began scrapping OTHs without first obtaining Allfirst's permission or consent, and Allfirst never complained that these cars were being scrapped without its consent.

scrap and remove a car from the transaction.  At the February 10

meeting, Martini explained that the OTHs were in worse shape

than anyone had expected and that significant repairs were

necessary to re-lease these cars.  Defendants did not want to

bear these extensive repair costs, particularly since virtually

no market existed for these cars.  Thus, Martini offered to pay

Allfirst the applicable SLV and take the cars out of the deal

with Railcar absorbing the losses.  Crook agreed to the deal as

set forth by Martini.  At no point did Martini say that, as a

condition to this modification, the FLDG amount would be reduced

to account for the reduced number of cars in the transaction.

Nor would it have been consistent with the parties' overall

intent to do so.  The Court does not accept as accurate[28]

Martini's testimony that he assumed that this modification would

include a pro rata reduction of the FLDG.

Martini, in an internal memorandum to Smallwood dated March

23, 2000, explained the scrapping that occurred pursuant to the

February 10 agreement and the business ramifications of "passing

a portion of the loss on to the bank" by taking a credit against

the FLDG.  (Pl.'s Trial Ex. 35 at 007019).  In this memo,

Martini states that he "thinks the loss . . . should be matched

up with the guarantee [FLDG]," but points out, on the other

---

[28]    The Court is not finding that Martini deliberately
testified falsely but finds that, on this matter, his
recollection is not reliable.

29

hand, that "[o]ur business is dependent upon our ability to finance our portfolio using structures that allow us to remove them [railcars] from our balance sheet.  Imposing a loss on Allfirst would almost certainly eliminate them as a potential finance partner in the future . . . it is a small industry, and our other lenders would know in time what happened."  (Pl.'s Trial Ex. 35 at 001019).

At the February 10 meeting, Martini was aware of the consequences of a decision to reduce the FLDG.  The March 23 memorandum makes clear that Martini was interested in maintaining the long relationship he had developed with Allfirst.  Shifting the losses to Allfirst would have destroyed this important business relationship and would have potentially harmed Railcar's reputation among the other banks.

Defendants now seek to shift a portion of the CSX/NS OTH losses to Allfirst.  This position is inconsistent with Martini's statement during the February 10 meeting that Railcar would absorb all of the attendant losses and his desire to maintain a working relationship with Allfirst.

In accordance with the foregoing agreement, Railcar took 267 CSX/NS OTHs out of the transaction.  Defendants paid Allfirst the applicable SLV for 255 of these.  As for the other

12 cars, Defendants paid only the scrap price for 11[29] and paid nothing for one[30] of these. Of the 133 CSX/NS OTHs remaining in the transaction, Defendants accidentally sold six to Transamerica and, by agreement, paid Allfirst the SLV for those cars.[31] Accordingly, of the 400 CSX/NS OTHS, 127 remained in the Portfolio Transaction to the end.

In sum, with regard to the 400 CSX/NS OTHs, Allfirst is entitled to recover from Defendants the difference between the scrap price paid and the SLV for eleven cars (Railcar car record numbers: 418, 454, 458, 488, 490, 606, 789, 824, 835, 855, 901) and the SLV for one (Railcar record number 431), with pre-judgment interest from the respective dates of payment. There is no reduction of the FLDG limit with regard to any payments made by Defendants with regard to the payments made in respect of the CSX/NS OTHs.

---

[29]    Railcar car record numbers: 418, 454, 458, 488, 490, 606, 789, 824, 835, 855, 901.

[30]    Railroad record number 431.

[31]    Allfirst permitted Railcar to repurchase these cars for the SLV with no reduction in the FLDG amount. (Trial Tr. 270:18-23; Defs.' Ex. 600(C)). At trial, counsel inquired about seven cars, but an analysis of Trial Exhibit 600(C) reflects that only six cars were sold. Railcar remitted the SLVs for each. (Am. Proposed Findings [Document 75] at 7).

## 2. The 99 CSX Boxcars

Ninety-nine boxcars were on lease to CSX when the Parties entered into the Portfolio Transaction. In late 2000, Railcar sought to purchase these cars from Allfirst for their SLV, as Railcar wished to use them in a different transaction. Allfirst permitted Railcar to repurchase the cars for the SLV and the Parties agreed that, although the overall transaction was reduced by 99 cars, the FLDG amount would not be affected. (Trial Tr. 269:13-270:10).

These 99 railcars are not at issue.

## 3. The Seven Reacquired Cars

Defendants reacquired seven railcars[32] from Allfirst throughout the course of the transaction, paying Allfirst the SLV for each. (Defs.' Trial Ex. 600(C)). At argument, Defendants were not willing to forego the contention that the FLDG limit must be reduced by the SLV payments made with regard to these seven cars. (Hr'g Tr. 51-53, Oct. 21, 2004). However, there appears to be no reason to do so.

Accordingly, there is nothing to resolve with regard to these seven railcars.

]

---

[32] Railcar car record numbers 97, 104, 115, 191, 327 and 381 were boxcars. Railcar car record number 274 was a gondola.

### 4.   The 3 Nonexistent Boxcars

Inadvertently, Defendants included in the Portfolio Transaction the sale to Allfirst of three boxcars, (car record numbers 71, 142, 192), that, having been previously scrapped, did not exist at the time of purchase.  Allfirst paid Progress $9,323.08 for each of the three cars identified.

As to two of these railcars, (record numbers 142 and 192) Allfirst acknowledges that it is owed no damages as Defendants have since compensated Allfirst for each.  (Am. Proposed Findings [Document 75] at 8).

The parties have agreed that Allfirst is entitled to a recovery with regard to the third car (record number 71) and have stipulated as to the appropriate method for calculating damages.[33]  (Hr'g Tr. 2562-66, July 10, 2003).  Employing this method, the amount due as to car 71 is $8,946.12 (with pre-judgment interest from May 1, 2003).  (Hr'g Tr. 2562-66, July 10, 2003; Am. Proposed Findings [Document 75] at 8.)  There is no reduction of the FLDG with regard to this payment.

---

[33]    The parties agreed on the method of calculating damages for this non-existent car.  (Hr'g Tr. 2562-66, July 10, 2003). Allfirst is owed interest at 7.26% on the purchase price of the car through the end of the Minimum Term on November 30, 2001, as well as a return of the purchase price as of that date.  This sum is $11,353.66.  Interest at the rate of 6% is added to this amount thereafter until May 1, 2003, at which point the principal is reduced by $3,200 for the scrap price paid by Defendants.  Therefore, the total amount due as of May 1, 2003 is $8,946.12.

Defendants contend that, with regard to the three nonexistent boxcars, the FLDG should be reduced pro rata based on a sale of 993 cars. (Hr'g Tr. 54-56, Oct. 21, 2004). The Court agrees that, because Allfirst received reimbursement of the purchase price for these three railcars, the Portfolio Transaction has, in effect, been modified to involve 993 rather than 996 railcars.

Accordingly, in regard to the three nonexistent railcars, Allfirst is entitled to recover $8,946.12 (with pre-judgment interest from May 1, 2003) and the FLDG is reduced pro rata by virtue of the reduction of the Portfolio Transaction from 996 to 993 railcars.

### 5.   The Four Cars Subject to Casualty

Progress contends that one boxcar (record number 126) and three gondolas (record numbers 278, 762, 772) were subject to casualty.

The FLDG provides that in the event a car "suffers a casualty occurrence[34] . . . (i) PRSC [Progress] guarantees the timely payment of the casualty payment required under the lease, and (ii) PRSC [Progress] shall promptly pay to [Allfirst] any amount by which the casualty payment required under the Lease is less than the SLV." (Pl.'s Trial Ex. 1 at A0577)

---

[34]   As defined in the applicable Lease.

### a. Car 278

As to car 278, Allfirst admits no damages are owed because Defendants paid Allfirst the casualty payment for the total loss of the car, which was destroyed on April 1, 2001. On November 1, 2002, Defendants paid Allfirst $22,000 for the casualty. Defendants now argue that this payment exceeds the car's SLV, which, as of March 31, 2001, was $18,458.21, and seek to have their overpayment refunded.

The Assignment Agreement directs Allfirst to deposit in the Reserve any "proceeds of insurance or other payments with respect to the casualty to a Car . . . in excess of the Car's Stipulated Loss Value." (Pl.'s Trial Ex. 1 at A0532 §11(ii)). Pursuant to the terms of the Assignment Agreement, amounts in the Reserve shall first be applied to Allfirst "with respect to any Cars that have suffered casualty . . ., for any shortfall in the Stipulated Loss Value" that Progress has failed to pay. (Pl.'s Trial Ex. 1 at A0533 §11(a)).

The Court finds that Progress was required to, and did, remit the full casualty payment to Allfirst. The casualty payment of $22,000 was not in error, as Progress asserts, but rather reflected the value of the car at the time of payment. Defendants may not now seek a refund. The excess $3,541.79 shall be deemed to have been deposited in the Deficiency Reserve Account as of November 1, 2002 and is herein applied to as to

reduce Defendants liability with regard to cars 762 and 772,
discussed below.

b. Cars 762 and 772

On October 11, 2002, Defendants paid Allfirst a total of
$3,072.00 for two cars subject to casualty, record numbers 762
and 772, ($1,536 for each car).  Despite Progress's claim and
the notations made in the "Railcar Ltd. Data System" that cars
762 and 772 were "Destroyed – Casualty" on February 28, 2000,
(Defs.' Trial Ex. 600(C)), Allfirst contends that Defendants
have provided insufficient evidence that the cars were in fact
destroyed in a casualty, rather than simply scrapped.  The Court
disagrees and finds the data presented in the Railcar Ltd.
Datasystem (Defs.' Trial Ex. 600(C)) is reliable.

Pursuant to Section 1.3(ii) of the FLDG, Defendants must
pay Allfirst any difference between the casualty payment and the
SLV.  The $3,072.00 Defendants paid on the cars is the
equivalent of the casualty payment for each.  Therefore,
Allfirst is owed the difference, calculated to be $30,044.70.[35]

Pursuant to Section 11(a) of the Assignment Agreement the
$3,541.79 overpayment in connection with car 278, which the
Court determined became available in the Reserve as of November

---

[35]    The Court accepts Allfirst's calculations that the
difference between the scrap proceeds ($3,072) and the SLV
($33,116.76) as of February 28, 2001 for both cars amounts to
$30,044.76.

1, 2002, shall be applied to any shortfall in the SLVs that Allfirst had not received from Progress. The $30,044.70 balance outstanding on the two cars as of October 11, 2002, will be reduced to $26,502.91 as of November 1, 2002. Therefore, Allfirst shall recover from Defendants $26,502.91 in regard to these cars..

In addition, the FLDG requires prompt payment of any difference between the SLV and casualty payment. Therefore, as to these cars, Allfirst shall recover from Defendants pre-judgment interest on $26,502.91 from October 11, 2002.[36]

c. <u>Car 126</u>

Defendants claim that car 126 was destroyed on February 25, 2001. However, the Railcar Ltd. Database shows that the car was "Destroyed - Casualty" on April 26, 2000, after coming off the Oil Creek & Titusville lease on January 1, 2000. (Defs.' Trial Ex. 600(C)). On May 19, 2003, Defendants paid Allfirst $2,388.00 for the car. Allfirst argues that it is owed $5,547.33, which is the difference between the scrap proceeds ($2,388.00) and the SLV ($7,935.33) as of April 26, 2000. Defendants agree they are responsible for paying the full SLV. (Hr'g Tr. 76:7-23, Oct. 21, 2004).

---

[36] The Court notes, but finds de <u>minimis</u> and ignores, the interest on $3,541.79 that would have accrued during the period October 11, 2002 through November 1, 2002.

The Court finds that Car 126 was destroyed in a casualty on April 26, 2000. As discussed supra, because Progress failed to remit the entire SLV, the Court finds Allfirst is entitled to the difference, $5,547.33.

Allfirst also asserts that Defendants must pay interest on the SLV for failure to pay in a timely manner. The Court finds that the Assignment Agreement and FLDG both provided for the prompt remittance of casualty and SLV shortfall payments. Using any reasonable definition, a payment remitted three years later cannot be considered prompt. Accordingly, the Court finds Allfirst is entitled to an additional recovery of $421[37] with regard to this car.

Thus, the total recovery with regard to Car 126 is $5,968.33 (with pre-judgment interest from May 20, 2003).

### d. FLDG Limit Reduction

Defendants contend that, for cars 126, 762 and 772, the FLDG limit should be reduced to make up for any shortfalls between the SLV and casualty payments. Allfirst claims that no credit should be given because Defendants failed to provide sufficient notice of the alleged casualties as required by the

---

[37] Interest on the three year late payment of $2,338 calculated at the pre-judgment interest rate of six percent per annum from the date of the casualty (April 26, 2000) to the payment date (May 19, 2003).

Assignment Agreement, and failed promptly to remit full payment
of the SLV.

It is true that Defendants failed to monitor the status of
these cars to comply with the terms of the Portfolio
Transaction. The Assignment Agreement requires Progress to
provide notice in writing to Allfirst of casualties, and
promptly to remit any casualty payments. (Pl.'s Trial Ex. 1 at
A0529 §§ 6, 6.1). The FLDG also requires Progress to "promptly
pay to [Allfirst] any amount by which the casualty payment . . .
is less than the [SLV]." (Pl.'s Trial Ex. 1 at A0577 §1.3).
The FLDG is then to be "reduced by the amount of any payments"
Progress made pursuant to the FLDG. (Pl.'s Trial Ex. 1 at A0578
§2.1(i)). Thus, under the FLDG, Progress is entitled to reduce
the FLDG limit by the amount of payments made to make up any
casualty payment shortfalls.

While Defendants failed to follow the agreed-upon
procedures, by virtue of the instant decision, Allfirst is being
made whole by payment of the full amounts due with interest by
virtue of the late payment. Accordingly, the FLDG limit shall
be reduced by the principal amounts paid by Defendants to make
up casualty payment shortfalls.

e.    Summary

With regard to the four railcars subject to casualty,
Allfirst is entitled to recover:

As to Car 228:            No Recovery

As to Cars 762 & 772:     $26,502.91 (with pre-judgment
                          interest from  October 11, 2002).

As to Car 126:            $5,547.33 (with pre-judgment
                          interest from May 1, 2003); plus
                          $421 additional interest on late
                          casualty payment.


The FLDG shall be reduced by $32,050.24,[38] the principal
amount of these payments.


### 6.    The 38 Railcars Scrapped Without Consent

Defendants scrapped 38 railcars without obtaining
Allfirst's consent to the scrapping, or agreement to the scrap
price, as required by the Portfolio Transaction.  For these 38
railcars, Progress paid:

- The SLV for 22 cars,[39]

- The scrap price for 14 cars,[40] and

- Nothing for 2 cars.[41]

(Am. Proposed Findings [Document 75], Ex. J).

---

[38]    The $421 interest payment relating to car 126 is not
included in this amount.

[39]    Cars with record numbers: 11, 45, 60, 62, 65, 66, 67, 70,
76, 79, 88, 89, 101, 117, 118, 134, 137, 143, 155, 164, 165,
236.
[40]    Cars with record numbers: 17, 23, 358, 63, 78, 105, 121,
125, 157, 174, 176, 182, 190, 201.

[41]    Cars with record numbers: 196, 234.  The Railcar database
shows the status of Car 234 as "stored with Lessee."

These railcars were off-lease not earning rent and not in a
condition to be leased again.  Therefore, Section 1.1.3 (ii) of
the FLDG governs the Parties actions. It appears from the
Railcar database that the majority of these cars were scrapped
before the end of their lease terms.  This would indicate that
there was a lease default.  However, cars 79, 176, and 190 were
scrapped after the expiration of a lease.  Nevertheless,
Defendants did not attempt to repair and re-lease the cars.
Also, Car 117 was scrapped before the lease term even began, and
Cars 78, 121, 125, 137, 157, 182, and 201 were scrapped while on
month-to-month leases.

The FLDG defines the parties' rights in the event of a
lessee's default.  After 90 days of default, Allfirst may sell
the cars to a third party at fair market value.  (Pl.'s Trial
Ex. 1 at A0576 (FLDG § 1.1.3)).  After 180 days, if the car is
not sold, the car may be scrapped and Defendants "shall pay
[Allfirst] any amount by which the net proceeds received as a
result . . . of scrapping is less than the [SLV]."  (Pl.'s Trial
Ex. 1 at A0576 (FLDG § 1.1.3(ii)).

The Court finds that the cars were scrapped without
Allfirst's knowledge or consent, and that as to the cars for
which payment was made to Allfirst, the scrap payment was often
received by Defendants two or three years before the scrap price
or SLV was remitted to Allfirst.  (Defs.' Trial Ex. 600(C)).

Therefore, Defendants' actions breached Section 1.1.3 of the
FLDG, because these cars were not included in the February 10
agreement.

a.  Recovery

As to the 22 railcars for which Defendants paid Allfirst
the SLV, there is no recovery of principal, but Allfirst shall
recover an amount equal to 6% simple interest from the date of
scrapping to the date of payment and shall receive prejudgment
interest on that amount from the date of payment.

As to the 14 cars for which Allfirst received only scrap
proceeds, Allfirst shall recover the principal amount of
$73,545.84,[42] constituting the difference between the scrap
proceeds and the SLV calculated as of the day the car was
scrapped.  (Hr'g Tr. 61:4-13, Oct. 21, 2004).  Allfirst shall
also recover an amount equal to 6% simple interest on said
principal from the day of scrapping to the day of payment.
Allfirst shall also recover prejudgment interest on the total
from the date of payment.

As to the two cars which Progress scrapped and remitted no
payment, Allfirst is entitled to recover the SLV in effect for
each car on the date that the cars were scrapped, $16,259.42

---

[42]   The Court accepts Allfirst's calculation that this amount
totals $73,545.84.

(Hr'g Tr. 61:4-13, Oct. 21, 2004) plus pre-judgment interest on

that amount from the date of scrapping.[43]

### b.  FLDG Adjustment

The parties disagree as to whether there should be an

adjustment to the FLDG for MNR payments made after the cars were

scrapped, and for the amounts paid to make up the difference

between the scrap prices paid and the SLV.

Defendants argue that all payments should reduce the FLDG

because Allfirst did not object to the scrap or SLV payments and

did not instruct Defendants to repair cars rather than scrap

them.

Allfirst asserts the FLDG should not be affected because

Allfirst was harmed when Progress sold the cars for scrap to

Railcar because the sale was not at arm's length.  Allfirst

claims that, because the sale occurred internally rather than to

a third party, there is no way to establish what each car was

actually worth.  Allfirst also claims that Progress missed

opportunities to lease the cars, and could have placed the cars

in the market successfully, if the cars had been repaired rather

than scrapped.

The Court finds, as contended by Allfirst, that the scrap

prices paid to Allfirst for the cars in question were not

---

[43]    Car 234 was scrapped July 1, 2003 and Car 196 was scrapped
January 28, 1999.

determined in arms-length transactions and cannot be found to
have been for fair market value. However, because Allfirst is
receiving the SLV for each car and being granted interest with
regard to deferred payments, the absence of a fair market scrap
price is not significant. The Court does not find Allfirst to
have established that there were reasonable leasing
opportunities for the scrapped cars.

To extent that Defendants paid MNR for cars after they were
scrapped, Allfirst was overpaid. The FLDG limit shall be
reduced with regard to such payments.


7.    The 29 Rail-Tex-52 Railcars

It appears from the Railcar database that 29 cars from the
RailTex-52 lease were either scrapped or placed in storage.
(Defs.' Trial Ex. 600(C)). In the absence of any evidence
establishing an issue,[44] these railcars need not be discussed.

---

[44]    "Mr. Gebhardt, this is your party to the extent that at the
end of the day, you have to be satisfied that I can go to this
record and when all is said and done, I can deal with every car.
Because if a car is not dealt with, it's just not dealt with."
(Hr'g Tr. 4-5, Oct. 21, 2004).

8.    The 14 Like Kind Exchanged Railcars

Defendants scrapped 14 railcars originally in the
transaction[45] (the "Original Cars") and substituted 14 other
railcars.[46]  The like kind exchange ("LKE") should have been done
in accordance with Section 18 of the Service Agreement, which
provides:

> To the extent that the Lease authorizes the lessor to
> substitute Cars (for example, to replace a casualty
> Car or a Car for which the repair costs would be
> uneconomical, or where customer service considerations
> make it advisable to replace a Car rather than waiting
> for its repair), Servicer may act as FM's [Allfirst's]
> agent to exercise the rights and powers of the lessor
> concerning substitution of Cars.    Servicer shall
> notify [Allfirst] of any such substitution.    In the
> event Servicer decides to substitute any Cars, then
> with the consent of [Allfirst], which consent shall
> not be unreasonably withheld, Servicer may do so by
> means of a like-kind exchange with [Allfirst] pursuant
> to documentation satisfactory to [Allfirst] and at the
> cost and expense of Servicer for all costs, including
> attorneys' fees, of Servicer and [Allfirst] in
> connection with such like-kind exchange, provided that
> the substitute Cars meet all requirements for
> interchange and have a comparable value, age, and

---

[45]    CSX OTHs with car numbers/record numbers: SPSX 62875
(#390), SPSX 62903 (#391), SPSX 63052 (#392), SPSX 478807
(#434), SPSX 472334 (#503), SPSX 473233 (#518), SPSX 473969
(#527), SPSX 477739 (#559), SPSX 479665 (#580), SPSX 482518
(#608), SPSX 482989 (#619), SPSX 483482 (#851); DM&E boxcars
with record numbers: DME 3517 (#927), DME 3364 (#957).

[46]    ([Document 74]; Defs.' Trial Exs. 383, 600(c)).  Defendants
sold and Allfirst received the proceeds for substituted cars
bearing mark numbers: SPSX 489 (old #390); SPSX 7067 (old #391);
SPSX 85046 (old #392); SPSX 500043 (#434); SPSX 7028 (old #503);
SPSX 490 (old #518); SPSX 40019 (old #527); SPSX 500061 (old
#559); SPSX 500024 (old #580); SPSX 811912 (old #608); SPSX
500122 (old #619); KPXX 188441 (old #851); DME 3116 (old #927)
and DME 3130 (old #957).

residual value to Cars being replaced and are free and
clear of all liens and encumbrances.

(Pl.'s Trial Ex. 1 at A0603 (Service Agreement § 18)).

While there had been a substitution for the Original Cars,
Defendants erroneously paid Allfirst the SLV for these 14 cars
totaling $104,936.66 (Def.'s Trial Ex. 600(C)) and MNR for these
cars totaling $23,860.34.

Allfirst agrees that Defendants are entitled to a return of
the mistaken Minimum Net Monthly Rental payments, but contends
that Defendants did not follow the LKE procedures set forth
above and are not entitled to the SLV payments.  Allfirst argues
that, because Defendants did not notify Allfirst of the LKE,
Allfirst did not have an opportunity to consent to the exchange.
In addition, Allfirst was not provided with documents to
evidence that the cars' ownership was transferred.  For these
reasons, Allfirst contends that Defendants did not properly
perform an LKE for the cars and thus Allfirst is entitled to the
SLV for each car and a calculation of damages as if the cars had
never been exchanged.

Defendants argue that Allfirst must return the mistakenly
made SLV payments because Allfirst was notified that an LKE of
the cars was actually made and the SLV payments were remitted in

error, due to incorrect information provided by Defendants'
outside auditor.[47]

The Court finds that there is some fault on both sides
regarding the erroneous treatment of these 14 cars.  While
Defendants did not comply with the notice requirements of
Section 18, Allfirst was effectively put on notice that at least
some of the original Cars had been scrapped and replaced with
like kind cars.

Allfirst was generally apprised of Defendants intent to LKE
some of the 400 "coal cars" and were aware of the fact that
Defendants had already performed an LKE of 15 of the "CSXT"
cars.  (Pls.' Trial Ex. 34).  Independent of, and unrelated to,
that general discussion, on April 9, 2001, Edelman notified
Allfirst that Defendants' outside consultant had determined that
multiple cars (including the 14 cars at issue) had been scrapped
and that Edelman would wire funds to "buy back" these cars.
(Pl.'s Trial Ex. 59).  In addition, one month after the SLV
payments were sent for the "buy back," Edelman notified Allfirst
that the SLV payments for cars with record numbers 580 and 619
(among seven other CSX cars not at issue) were made in error and

---

[47]     Defendants hired BDO Sideman to conduct an audit of the
deal to determine the status of each car and whether Allfirst
was owed any money for scrapped cars or cars subject to
casualty.  Defendants assert that BDO Sideman was unaware of the
LKEs, which resulted in the mistaken SLV payments.

requested that the payments be returned.  (Defs.' Trial Ex. 383).

Thus, Allfirst received appropriate notice of and approved the LKE for cars 580 and 619.  In addition, even if Allfirst had received the proper notice for the other 12 Original Cars, it would not have had a reasonable basis to withhold consent for the LKE so as to justify refusal under section 18.

Accordingly, the Court finds that Defendants erroneously paid Allfirst the SLV and MNR with regard to the 14 Original Cars and is entitled to a recovery[48] of the SLV payments totaling $104,936.66 (Def.'s Trial Ex. 600(C)) and the MNR payments for these cars totaling $23,860.34.  Defendants are also due prejudgment interest for these amounts from the respective dates of the erroneous payments.

Inasmuch as Allfirst is returning these payments to Defendants, the FLDG limit shall not be affected by the SLV and MNR payments made regarding the 14 Original Cars.

### D.   Claims for Missed Rent Opportunities

#### 1.   Chattahoochee Industrial Railroad Lease

Allfirst alleges that, in January 2000, Chattahoochee Industrial Railroad ("CIRR") entered into a two-year, full

---

[48]   Or offset.

service lease with Railcar for 90 OTHs, with monthly rental payments of $312 per car.[49] Of the 90 leased cars, 56 belonged to Allfirst and, of those cars, 54 are in dispute.[50] Allfirst asserts that CIRR preferred a three-year lease but Railcar only offered a two-year lease because of concerns regarding the condition of the cars. Allfirst claims that 32 of the 54 cars fell out of the two-year CIRR lease because of their poor conditions, even as an additional 24 Allfirst OTHs were off-lease and available to be placed in the CIRR lease.

Allfirst received a total of $375,297.53 in rental payments from its cars on the CIRR lease, but argues that it would have earned $403,352.00 had all 54 Allfirst OTHs been on lease to CIRR for the full two-year lease period. Additionally, Allfirst claims that, had the 24 unused Allfirst cars been placed in the CIRR lease, Allfirst would have earned an additional $179,712.00 in rental payments.[51] Allfirst also argues that, had Defendants

---

[49] Allfirst owned 56 cars of these cars, each with a Minimum Monthly Net Rental of $239.

[50] Two of the 56 Allfirst cars placed in the CIRR lease were scrapped and thus the parties only dispute the proper treatment of 54 cars.

[51] Twenty of the 24 Allfirst OTHs were eventually placed in a lease with Kanawha River Terminal. Nevertheless, Allfirst argues that those cars should have been placed in the CIRR lease, as they would have earned significantly more rent under that lease. Allfirst notes that the 24 Allfirst cars not leased to CIRR during the three-year period earned only $61,655.20 in rental payments.

entered into a three-year lease rather than the two-year lease, Allfirst would have earned $292,032.00 for the third year. Allfirst calculates that it would have earned $439,143.27 above what it actually earned in rental payments over the two year period, and that Defendants would have earned an additional $130,884.84. Finally, Allfirst claims that, because Minimum Net Monthly Rentals are measured on a cumulative basis, the difference between what the cars earned and what Allfirst claims they could have earned under this lease should be applied to offset any credits Defendants may have against the FLDG.[52]

CIRR's lease ended in December 2001. CIRR wished to renew for an additional three to five years for up to 110 cars. Allfirst claims that its OTHs were available to fill this lease,[53] but that CIRR instead entered into a lease with another company out of concern for the condition of the cars in the initial CIRR lease. Allfirst calculates that, had its cars been placed in the renewal lease, they would have earned an

---

[52]     Allfirst claims that the amount Railcar paid Allfirst during the three years for the 78 cars was $430,903.63 as compared to the $876,292.47 that Allfirst argues should have been earned.

[53]     The cars Allfirst claims were available for the second CIRR lease were the 78 cars Allfirst argues could have been placed in the initial CIRR lease as well as 32 additional cars that were coming off the Martin Marietta lease.

additional $257,400.00 from January 2003 through March 2003.[54]

Allfirst also calculates that if the 32 additional Allfirst OTHs
that were available from the Martin Marietta lease had been
placed in the lease from April 1, 2002 through November 2003,
they would have earned $182,400.00.[55] Allfirst claims that,
instead, Defendants did not pay for the 78 cars from January
2003 through November 2003 or for the 32 cars from April 1, 2002
through November 2003, even though Allfirst was entitled to the
Minimum Net Monthly Rentals for those cars during these periods.
Allfirst claims that the excess rent that allegedly could have
been collected should be applied to offset any claims made by
Defendants against the FLDG.

In opposition, Defendants explain that in September 1999,
when they entered into the CIRR lease, Ed Holt ("Holt") of
Railcar and CIRR together selected 89 OTHs to be placed in the
lease, 56 of which belonged to Allfirst.[56] Defendants admit
that CIRR was originally interested in a three-year lease, but
explain that

> Holt felt that after CIRR rejected rebodied coal cars
> offered by Railcar, the remainder of the cars under
> Railcar's management owned by Allfirst and others
> might not last for three years. So Allfirst proposed,

---

[54]   Allfirst assumes the average fair rental values presented
by its expert witnesses, James Husband ("Husband") and Trey
Savage ("Savage").
[55]   Allfirst again assumes the average fair rental values of
Husband and Savage in making this calculation.

[56]   33 had been sold to Transamerica.

> CIRR accepted, and Allfirst approved a two-year lease
> with an option for a third year.

(Ltr. from Benjamin Rosenberg, Aug. 28, 2003 [Document 76-2] at 2; Trial Tr. 1422; Defs.' Trial Ex. 125).

Defendants assert that there is "no evidence to suggest that CIRR did not select more Allfirst cars because of their condition, or that other Allfirst cars were then available at the inspection location for selection by CIRR." (Rosenberg Ltr. at 2; Trial Tr. 1432). Defendants claim that the cars had been maintained since November 1998 and that there was no evidence that Defendants refused to make repairs on Allfirst cars.[57] Defendants argue that Railcar was "under no contractual obligation to favor Allfirst cars in the remarketing process . . . [and that t]he evidence was undisputed that Railcar's practice in remarketing was non-discriminatory."[58] Defendants also point out that 22 of the 24 Allfirst railcars that Plaintiff claims were available but not placed in the lease were, in fact, not available at the time that CIRR made its selection of cars.

---

[57] In fact, Defendants point out that more than $100,000 was spent on Allfirst cars to prepare them for the CIRR lease. (Trial Tr. 1430-32; Pl.'s Trial Ex. 16).

[58] Allfirst, in response to the assertion, argues that "the Assignment Agreement and Service Agreement . . . clearly obligate Defendants to favor Allfirst cars. Defendants were Allfirst's remarketing agent and as such, had an agent's fiduciary duty to Allfirst, the principal." (Allfirst's Response to Defs.' Post-Hr'g Mem. at 6). For this reason, Allfirst claims it was improper for Railcar to place their own cars in a lease if Allfirst cars were available.

Soon after these 22 cars became available, 20 were placed in the Kanawha River Terminal lease.  Finally, Defendants content that, with respect to the 32 cars that fell out of the lease as a result of their condition, the cost of repairing the cars would have exceeded any rental payments the cars would have earned in the lease and thus it was not economically sound to repair the cars.

With respect to the 110 cars that Allfirst claims should have been placed in a renewal lease, Defendants claim the cars would have required complete rebodying to last the entire lease period and that, even if the lease began in 1998 or 1999, the cars, in all likelihood, would not have lasted the duration of the lease.  Finally, with respect to the cars from the Martin Marietta lease discussed infra, Defendants point out that the lease did not expire until April 2002, four to five months after the CIRR lease was scheduled to begin.

The Court finds that Allfirst has not established entitlement to damages with regard to the CIRR leases.  While there are arguments on both sides, Allfirst has not established by a preponderance of the evidence that Defendants breached the Portfolio Transaction as modified by the February 10, 2000 agreement discussed supra with regard to the management of these leases.

## 2.   Martin Marietta Lease

In April 2000, Martin Marietta ("Marietta") entered into a two-year, full service lease with Railcar for 50 OTHs,[59] at rent of $250 per car per month.[60]   Although, three OTHs fell out of the lease due to their poor conditions, Railcar paid Allfirst the Minimum Net Monthly Rentals on the cars.   Allfirst asserts that, because the cars could have been kept in the lease had the cars been repaired, Progress is not entitled to a credit against the FLDG for the Minimum Net Monthly Rentals paid.   Defendants contended that the three cars earned virtually all of the rent payable under the Marietta lease, and there is no evidence that any rent was lost as a result of the condition of the cars.

Allfirst is not seeking damages with regard to these three railcars (Hr'g Tr. 128-29, Oct. 21, 2004;) and, in view of the small amount involved, Defendants are not pressing their contention that the FLDG should be adjusted by virtue of these cars.

## 3.   The Proposed OmniTrax Lease

In April 2001, OmniTrax wished to enter into a lease with Railcar beginning in May of that year for 20 ballast cars at

---

[59]   There are no issues as to eight of these cars which were scrapped with the agreement of the parties.   There are disputes as to the other forty-two of these cars.

[60]   The rate at which the cars were rented under this lease exceeded Minimum Net Monthly Rent by $50 per car for 22 of the cars and $11 per car for the remaining 20.

$230 per month for the first six months, and then $200 per month on a month-to-month basis thereafter. The lease was expected to terminate in 2002. The cars in the lease would earn rent for six months of the year and then remain in free storage for the remainder of the year.[61] Ultimately, Defendants determined that the proposed agreement was not economically beneficial and no lease resulted.

Allfirst claims that 20 Allfirst cars from a deal with the Heart of Georgia Railroad were available for this lease and would have earned $1,380 a car for the first six months and $1,200 the remaining six months - totaling $51,600 for all twenty cars for the full lease term. Because the lease never materialized, Railcar paid Allfirst $15,000 for these cars as MNR from May 2001 through July 2001, rather than the $13,800 that Allfirst claims it would have received for those cars if they had been on lease to OmniTrax. Allfirst acknowledges that Progress would be entitled to a credit against the FLDG for $1,200 - the difference between the MNR and the rent that could have been collected under the lease.

---

[61]    Defendants confirm that the OmniTrax lease was for 20 ballast cars to be used by OmniTrax from September 1, 2001, or upon receipt of the cars, until November 1, 2001 at $230 per car per month, full service, with free storage by the lessee until May 1, 2002. Then the cars would be used from May 1, 2002 until October 1, 2002 at $230 per car per month, full service, with free storage by the lessee thereafter.

Allfirst received no rent during the post-Minimum Net Monthly Rental period and, as a result, argues that it is entitled to damages in the amount of the MNR due on the cars for the remainder of the Portfolio Transaction term.

Defendants respond that they began lease negotiations with OmniTrax to market Allfirst ballast cars equipped with something called "Rogers Gates," which rapidly were becoming obsolete. When negotiations began, Larry Smith ("Smith"), of Railcar believed that the ballast cars could be moved from their current location with the Georgia Northeastern Railroad ("GNRR") in Georgia to a railroad in Wisconsin at no cost.[62] Once Smith discovered that the cars could not be moved without cost, he concluded that the OmniTrax lease would not be economically beneficial to Allfirst, as Allfirst would incur the cost of transporting the cars. Further, Defendants claim that, although Pistell asked Allfirst about the Omnitrax deal, there is no evidence that Allfirst ever approved the proposed lease. Defendants claim that each car would have earned, at most, $1,610 under the Omnitrax deal, while the freight charges would have been between $1,500 and $2,000 per car. For these reasons, the lease with OmniTrax never materialized.

---

[62]    In the spring of 2001, Smith identified a potential lease in Canada. Smith understood that OmniTrax had made arrangements for free freight from the railroad in Wisconsin to the ultimate destination of the cars in Canada. At the time, the cars in question were being used by the GNRR under a terminable-at-will "free storage in exchange for free use" lease.

Additionally, Defendants note that Smith negotiated a lease for 18 of Allfirst's 40 ballast cars with Heart of Georgia Railroad beginning March 1, 2002. The ballast cars earned $23,921.83, making this a much better deal for Allfirst than the proposed OmniTrax transaction.

Allfirst denies that the costs of moving the cars from Georgia to Wisconsin were Allfirst's to bear, citing Section 5 of the Service Agreement which obligates Progress to "be responsible for and pay any charges in connection with the delivery of the Cars to the Lessees." Further, Allfirst notes that OmniTrax offered to pay the entire transportation costs for the cars, and not just the delivery costs as Defendants argue. Thus, the transportation costs were not an impediment to the lease.

The Court finds that Defendants were obligated to bear the entire cost of transporting the cars to the lease location. Accordingly, even if OmniTrax had not offered to bear the transportation cost, Defendants should have entered into the lease and, themselves, absorbed the transportation cost. With regard to this matter, Allfirst is entitled to the excess of the total available rent from the foregone lease ($51,600), less the MNR paid ($15,000), for a net of $36,600. Allfirst is also entitled to prejudgment interest on the net of $36,600 from the date of the last MNR payment made with regard to this lease.

Defendants are entitled to a credit against the FLDG of $1,200 for Minimum Net Monthly Rentals paid in excess of actual rent received on this lease.[63]

The Court further finds that Defendants' subsequent rental to the Heart of Georgia Railroad of 18 ballast cars does not offset Allfirst's recovery damages because a total of 40 ballast cars were available for rental. Therefore, the OmniTrax lease of 18 ballast cars would have left more than 20 ballast cars available for the Heart of Georgia Railroad lease.

### 4.  International Paper Lease

In January 2000, Railcar entered into a two-year lease with International Paper ("IP") for 20 MNA double plug door boxcars, with monthly rental payments in the amount of $200 per car. Twenty MNA boxcars from the RailTex-167 lease were sent to IP, but IP returned the cars because they were in poor condition.

Nine of these 20 IP leased cars were wrongfully scrapped. The Court has resolved the issues regarding these nine cars in its discussion of the 38 (including these nine) wrongfully scrapped railcars. The remaining 11 IP leased cars are discussed herein.

Had the 11 cars remained on the IP lease and earned rent, they would have earned $2,200 per month, or a total of $52,600.

---

[63] There should not be a duplicative credit if the overpayment is taken into account in the computation relating to the rent collection issue.

Instead, Railcar paid Allfirst $31,300 of MNR[64] with regard to these cars. Allfirst contends, therefore, that Defendants failed to maintain these 11 railcars and, as a result, failed to collect a total of $52,600, an amount that was $19,300 in excess of the $31,300 of MNR paid Allfirst. Defendants contend that Smith, of Railcar, attempted to develop a potential 20-car storage deal with IP, and convinced IP to take the 20 MNA boxcars although the cars were not the size and configuration that IP needed. Defendants argue that at least some of the 20 cars needed repairs, and that Railcar repaired many of the cars and would have continued to repair or replace others. However, IP chose not to enter into the lease because it required cars with more capacity than that of the Allfirst cars. Defendants assert that there is no evidence that if the MNA cars had been in better condition, IP would have leased them.

The Court finds that the cars in issue did not remain in the IP lease because of the poor condition of the cars and Defendants' failure to make necessary repairs.[65] If Defendants

---

[64] $150 per car per month for 19 months.

[65] For example, at trial, Smith testified on cross-examination:

Q: Sir, when you reported in the marketing report you said the deal didn't go because of the quality of the cars, isn't that right?

A: That was one of the issues, one of several issues.

had not breached their maintenance duty as to these 11 cars,
Defendants would have collected a total of $50,600 and paid a
total of $31,300 in MNR with regard to these cars. Consequently,
in the computation regarding the application of collected rents
set forth herein,[66] these 11 railcars shall be included as if
Defendants had collected the rent payable under the IP lease.

### 5. United States Sugar Lease

In July 2001, Railcar entered into an 18-month per diem
lease with United States Sugar ("U.S. Sugar") for 56 railcars.
Allfirst claims that only 19 of the cars placed in this lease
belonged to Allfirst, and that an additional 22 Allfirst cars
could have, and should have, been put into the lease for the
full 18-month term. Based on the average earnings for the 19
Allfirst cars in the lease,[67] Allfirst calculates that, had the
additional 22 cars been put into the lease, there would have
been an additional $101,665.08 in rental payments under the U.S.

Q: Well, sir the only issue you brought to the
attention of the people at Railcar in that marketing
meeting was the quality issue, isn't that right, per
your notes?

A: Yes, and it should have been elaborated there.

Q: But it wasn't, was it?

A: That is correct.

(Trial Tr. at 2090:4-14).

[66] See supra Section A.
[67] $256.73 per car per month.

Sugar lease.  Allfirst claims that five months worth of those additional rental payments, or $28,240.30, is attributable to the Minimum Net Term and that this amount provides an excess that should be applied to any claims made by Defendants to the FLDG for rental shortfalls.  Allfirst also claims that it is entitled to damages for the period after the Minimum Net Term ended in the amount of the difference between what Allfirst was paid for the cars and the MNR.

Railcar asserts that the 19 Allfirst railcars placed in the U.S. Sugar lease were Plate C sliding door boxcars that had previously been in the CSX-95 and CSX-35 leases.  Defendants contend that almost all of the remaining 130 Allfirst boxcars from the CSX leases were either reacquired by Railcar and upgraded to 100 ton cars, or were dedicated/moved to various other leases,[68] and none met the "sliding door" specification required by U.S. Sugar.[69]

The Court finds that Allfirst has not proven by a preponderance of the evidence that any additional Allfirst cars

---

[68]   These leases were with Columbus & Greenville, Bay Colony and Georgia Florida Railnet.

[69]   Defendants note that the 22 cars that Allfirst argues should have been in the U.S. Sugar lease were all either SCRF plug door boxcars or MNA double plug door boxcars that were on a per diem lease with RailTex.  Defendants note that the plug door boxcars are not comparable to the sliding door boxcars that US Sugar required in the lease.

could have been placed in the U.S. Sugar lease.[70] Accordingly, there is no recovery relating to the U.S. Sugar lease.

### 6. General Rental Opportunities

Allfirst seeks recovery with regard to railcars that were not leased by Defendants on the theory that there was a generally available market for the lease of such cars maintained in operable condition. Allfirst presented expert witness testimony regarding the fair rental value of the idle -off-lease and not earning rent- railcars in the Portfolio Transaction. However, the Court finds the testimony inadequate to establish any reliable estimate of rental that could have been earned from hypothetical leases. The evidence did not establish industry utilization rates, average fleet operability, bad faith on the part of Defendants or any other basis for awarding Allfirst damages based upon theoretically available rental opportunities.

Accordingly, the general rental opportunities issue does not result in any recovery.

### 7. Cars Falling Out of Leases

#### a. Oilcreek and Titusville Lease

Oilcreek and Titusville leased 37 Allfirst boxcars on what Allfirst claims was a full service per diem basis, with the

_____

[70] Moreover, Allfirst has not proven that any car placed in the U.S. Sugar lease was adequately comparable to the 22 available Allfirst cars.

two-year lease term beginning on January 1, 2001 (hereinafter the "Oilcreek Lease"). Allfirst claims that 35 cars fell out of the Oilcreek Lease due to their condition, of which 34 were stored and one was scrapped. The parties agree that proper treatment of the scrapped car would be as established by agreement at the February 10 meeting discussed above, and thus the treatment of 34 cars remains in dispute. Allfirst also complains that other cars not belonging to Allfirst were used to replace the 35 Allfirst cars that fell out of the lease.

The average earning for a car in the Oilcreek lease was $387.60 per car per month. Allfirst argues that, applying this average number to the months Allfirst cars were out of the lease, Allfirst lost $410,796.76 in rental payments on the Oilcreek lease through November 30, 2003. Of this amount, Allfirst contends that $183,711.54 is attributable to the Minimum Net Term of November 30, 2001 and provides an excess amount that should be applied to any claims for rental shortfalls made by Defendants to the FLDG.

Further, Allfirst argues that Defendants could have earned $275,255.81 for these cars for the period of November 30, 2001 through November 30, 2003. Railcar paid Allfirst $48,140.59 for the cars during this period. Therefore, Allfirst asserts, it is entitled to damages amounting to the difference between what was actually paid and the MNR for the cars during the same period.

Defendants contend that the Oilcreek Lease was actually a month-to-month lease that ran for well over the two-year period. Railcar entered into the lease because Smith believed it would help achieve the goal of utilizing Allfirst boxcars. While Oilcreek and Titusville wanted cars with greater capacity, Smith persuaded Oilcreek to keep the Allfirst cars until he could locate cars that met Oilcreek's requirements. Thus, Defendants claim, in 1999, Oilcreek leased Allfirst's cars from month-to-month until cars that matched Oilcreek's specifications became available. Defendants argue that, even though Allfirst cars were removed from the Oilcreek lease as Oilcreek's desired cars became available, a number of Allfirst cars remained on the lease even through the date of the trial. Further, Defendants argue that there is no evidence that Allfirst cars fell out of the Oilcreek lease as a result of their condition.[71] Defendants complain that, had they simply left the Allfirst cars on a different per diem lease with RailTex, the cars would have actually earned less rent.

---

[71] In support of this assertion, Defendants point to Plaintiff's Exhibit 116V, which lists seven cars from this lease that, as of August 28, 2001, were in the shop awaiting repair. Allfirst presented this document at trial in an attempt to demonstrate that the cars were never repaired. (Trial Tr. 2002:6-16). However, Defendants assert that the seven cars continued to earn rent on the Oilcreek lease after August 28, 2001 and, for some of the cars, well into the fall/winter of 2002.

The Court finds, as Defendants contend, that the Oilcreek Lease was entered into to improve the earnings and utilization for the entire fleet of Allfirst cars. The lessee wanted higher capacity cars but agreed to substitute lower capacity Allfirst cars until cars meeting the lessee's specifications became available. Additionally, Oilcreek and Titusville had space limitations with respect to the number of cars that they could keep and that, as higher capacity cars became available, it was necessary for them to return Allfirst cars. (Trial Tr. 2002:18-2003:2). It was for this reason, and not Defendants' failure to maintain the condition of the cars, that the cars were not kept on lease. Thus, Allfirst has not established a right to recovery with regard to the Oilcreek and Titusville lease.

b. <u>Five Per Diem Leases</u>

Allfirst contends that railcars fell out of five per diem leases due to Defendants' failure to meet their maintenance obligation. These leases are: (1) the per diem lease with Bay Colony for two Allfirst-owned boxcars from the CSX-95 lease from December 1999 through November 30, 2002; (2) the per diem month-to-month lease with New York & Atlantic for three Allfirst-owned boxcars from the RailTex-52 lease entered into July 1999; (3) the per diem lease with Georgia Florida Railnet for three Allfirst-owned cars from the CSX-95 lease for January 2000 through December 31, 2002; (4) the per diem lease with

Columbus & Greenville for three Allfirst-owned cars from the
CSX-95 and CSX-35 leases entered into June 2000 that were to run
through June 30, 2002; and (5) the month-to-month renewal per
diem lease with DM&E for 42 Allfirst-owned cars entered into
December 2000.

The Court finds that Allfirst has not established that the
railcars fell out of these leases as a result of their
condition, or due to any breach of the Portfolio Transaction on
the part of Defendants.

The Court finds, therefore, that Allfirst is not entitled
to any recovery with regard to the five per diem leases at
issue.

### E.   Section 27 Rent Claim

Section 27 of the Assignment Agreement provides that
Defendants are entitled to rent and other revenues earned by
railcars prior to the effective date of the assignment of the
leases in the Portfolio Transaction.

Defendants assert claims for the payments made during the
first three months of the Portfolio Transaction under the
Railtex 52 and Railtex 167 leases.

It is undisputed that, in the industry, per diem lease
payments can lag behind actual utilization by up to six months.
It is probable that some part of the first three months of these
leases would be attributable to pre-assignment use.  However,

Defendants have failed to prove, to any reasonable degree of certainty, what portion, if any, of the receipts in issue are so attributable.

Accordingly, the Court finds that Defendants have not established a right to recovery with regard to these leases.

F.    Storage Charges

During the course of the Portfolio Transaction, Defendants paid third parties for the storage of railcars.  Prior to April 2002, no invoices for third-party storage were forwarded to Allfirst, and no demands for payment were made.  In April 2002, Defendants began issuing invoices (totaling $170,000) seeking reimbursement of its payments for storage of Allfirst railcars.[72]

The Court finds that Defendants' payment of third-party storage charges during the term of the transaction was in accordance with the parties' agreement.   In fact, on August 30, 2001, Jeff Edelman of Railcar wrote that Defendants were not to scrap any Allfirst cars pending resolution of the present litigation and to store them on "[o]ur nickel."  (Pl.'s Trial Ex. 53).

Accordingly, Defendants are not entitled to any recovery with regard to its claim for storage costs.

_____

[72]    The Court notes that Allfirst objected to the consideration of storage fees.  (Trial Tr. at 2303).  The Court overruled the objection at trial and finds it appropriate to consider the evidence presented.

G.   <u>Disposition Damages</u>

The Parties agree that Allfirst was entitled to the disposition proceeds from 483 railcars that remained unsold as of the close of the evidence (the "Remaining Cars"). (Joint Stip. as to Disposition of 483 Railcars, Aug. 6, 2004 [Document 74]).

Allfirst claims that it is entitled to recover from Defendants the difference between the appraised fair market value of the Remaining Cars and the disposition proceeds.

Allfirst has introduced expert testimony estimating the fair market value of the cars, as of the close of the Portfolio Transaction, based on the premise that Defendants would maintain the cars in "interchange" and leasable[73] condition.

However, the estimates had been made more than a year prior to the operative date[74] and are not accepted as sufficiently reliable to establish Allfirst' claims for damages.

---

[73]   In correspondence to the Court dated January 5, 2009, Allfirst states its position is:

that Progress Rail merely had to keep the cars in an operable condition that would enable them to go out on lease and earn whatever rent might be available.

(Gebhardt Ltr., Jan. 5, 3009 [Document 82](emphasis added); Hr'g Tr. 7:8-11, Oct. 21, 2004).

[74]   The Portfolio Transaction ended on November 30, 2003.  The estimates provided by Allfirst's experts were in reports dated

Accordingly, Allfirst shall not recover any damages with
regard to its claim for the difference between the estimated
fair market value of the Remaining Cars and the actual
disposition proceeds.

H.  Attorneys' Fees

The Portfolio Transaction provides that, "[Defendants]
shall be jointly and severally liable for all reasonable
attorneys' fees and other costs and expenses incurred by
[Allfirst] by reason of any Event of Default or the exercise of
[Allfirst's] remedies hereunder." (Assignment Agreement,
Section 16.)  However, the Assignment Agreement also provides
that:

> [Defendants] shall be liable for and pay their own
> fees and expenses and, except in the event [Allfirst]
> is in breach of this Agreement, the fees and expenses
> of [Allfirst], including attorneys' fees and expenses
> incurred in connection with the preparation,
> negotiation, and execution of this Agreement, and the
> costs, expenses and fees of other attorneys, experts,
> and investment bankers or advisors and all STB search
> and filing costs and expenses relating to the
> transaction.

(Assignment Agreement, Section 21.)

As discussed herein, both sides, Allfirst and Defendants
have breached the Portfolio Transaction in various respects.
The Court will defer decision upon any award of attorneys' fees

---

February 28, 2002, which were updated on August 28, 2002, and
March 1, 2002.

and costs pending consideration of the "bottom line" computation and hearing further from the parties regarding the matter.

VI.   <u>CONCLUSION</u>

    For the foregoing reasons the Court decides that:

    1.    The parties shall confer to seek to agree[75] upon a computation consistent with this decision.

    2.    Plaintiff shall arrange a conference with Defendants and the Court at a mutually convenient time to discuss any unresolved computational issues, including any issues relating to the FLDG, and any other matters necessary for resolution prior to the entry of a final Judgment.

SO ORDERED, on <u>Friday, May 28, 2010</u>.


                          /s/
                    Marvin J. Garbis
            United States District Judge

---

[75]    Any such agreement would be only as to the computation based on the instant decision without prejudice to the right of any party to pursue appellate rights with regard to any aspect of the instant decision.