IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ALLFIRST BANK                          *

   Plaintiff and                  *
   Counter-Defendant
                                       *
          vs.                  CIVIL ACTION NO. MJG-01-2527
                                       *    (Consolidated with MJG-01-2991)

PROGRESS RAIL SERVICES
CORPORATION, et al.                    *

   Defendants and                 *
   Counter-Plaintiffs
*       *       *       *       *       *       *       *       *

MEMORANDUM AND ORDER RE: DAMAGES

     The Court has before it Plaintiff's Motion for Entry of
Judgment [ECF No. 160], Plaintiff's Motion for an Award of
Prejudgment Interest on Attorneys' Fees [ECF No. 183] and the
materials submitted by the parties relating thereto.

     In the Order Resolving [] Motion [ECF No. 190] ["the
Order"], the Court stated:

> 1.   Plaintiff shall recover damages for missed rental
>     opportunities in the amount of $2,195,045 with
>     prejudgment interest;
>
> 2.   Plaintiff shall recover disposition damages in the
>     amount of $267,469.82 with prejudgment interest; and
>
> 3.   Plaintiff shall not recover prejudgment interest in
>     regard to the award of legal fees.

     The Court, herein, states the reasons for the foregoing
decisions.  The Court has considered the evidence of record and
has had the benefit of the arguments of counsel.  The Court has

made its factual findings based upon its evaluation of the
evidence and the reasonable inferences drawn therefrom.

I.  <u>BACKGROUND</u>[1]

On November 30, 1998, Allfirst Bank ("Allfirst")[2] entered
into a complex agreement (the "Transaction") with Progress Rail
Services Corp. and its wholly owned subsidiary, Railcar Ltd.
(collectively, "Defendants").  In the Transaction, booked as a
sale,[3] Allfirst effectively "loaned" Defendants $13,220,351 and
obtained an assignment of the leases of 996 railcars.  The
Transaction established a guaranteed Minimum Net Rent ("MNR") to
be paid by Defendants each month to Allfirst regardless of the
actual rent receipts.[4]  However, if the actual collections for a

---

[1]  For a more complete background statement, see the Memorandum
of Decision of this Court [ECF No. 84] and appellate decision
[ECF No. 154].

[2]  Reference to "Allfirst" herein is intended to include any
predecessor or successor in interest to Allfirst Bank in regard
to the transaction at issue.

[3]  The deal was structured nominally as a sale of the railcars so
Progress could book a gain of $6,000,000 and remove the cars
from its balance sheet.  However, it is more realistically
described as a loan transaction whereby Allfirst lent Defendants
$13,220,351 and was to receive monthly remittances (Minimum Net
Rent) as effective "principal and interest" payments, with a
balloon payment (proceeds of the sale of the cars at the
Stipulated Loss Value) due at the end of the term.

[4]  The Transaction called for MNR to be paid regardless of actual
rental receipts during the first 36 months of the contract term.
After the initial 36 months, Defendants would pay Allfirst the
actual rent collected, not to exceed the MNR.  <u>See, e.g.</u>,

given month were less than the MNR, Defendants would make up the
shortfall.  On the other hand, if actual collections exceeded
the MNR, the overage would be remitted to Defendants as
reimbursement for service fees, with any excess "set aside" to
cover any future shortfalls in rent collections.

The Transaction provided for a Stipulated Loss Value
("SLV") for each car which would be payable to Allfirst if any
car was sold or scrapped, with Defendants making up any
shortfall between the actual sale/scrap value and the SLV.  To
qualify the transaction as a sale for accounting purposes, the
total payment of shortfalls (MNR and SLV) by Defendants was
capped at 9.995% of the original loan amount plus interest.
Thus, the risk of any shortfalls beyond the 9.995% cap was borne
by Allfirst. In other words, to account for the Transaction as a
sale, the "sellers" did not bear 10% or more of the risk of
loss.

The Transaction was memorialized in three documents:

1)    The Assignment Agreement (Allfirst, Progress and
      Railcar);

---

Allfirst Bank v. Progress Rail Servs. Corp., 521 Fed. App'x 122,
124 (4th Cir. 2013) ("Progress guaranteed that Allfirst would
receive the Minimum Net Rent for each railcar for three
years."); Hearing Tr., Sept. 11, 2015 [ECF No. 191], at 25 (Mr.
McAlpin (for Defendants): "[T]he obligation from Progress Rail's
standpoint to pay minimum net rent only existed during the first
three years of the term.  After that, it was -- we would
transmit actual rent, if I recall correctly.")

2)    The Service Agreement (Allfirst and Progress); and

3)    The Guarantee (the "First Loss Deficiency Guaranty" or
      "FLDG") (Allfirst and Progress).

The Transaction required Progress to maintain the railcars in the condition they had been in at the outset of the transaction, such that lease of the cars could yield the MNR. Additionally, Defendants were to act as Allfirst's agents with regard to leasing the railcars and were required to "operate [the railcars] in the same manner as it operates with respect to [their] own assets."  This included an obligation to market the cars for lease such that the MNR could be obtained.

At the time the Transaction was executed, all 996 cars were under leases.  However, in 1999, 400 of the leases terminated. It became apparent that these 400 leased cars would require extensive repairs in order to be re-leased, repairs that would cost more than the cars could earn if re-leased.  Thereupon, Railcar made the business decision to "park" most of the cars and simply pay the MNR to Allfirst out of its own funds.

In February 2000, representatives of Allfirst and Railcar orally agreed that Railcar could scrap all 400 of these cars, pay Allfirst the SLV for the cars, and remove them from the Transaction.  Railcar agreed to absorb the resulting losses; thus the FLDG limit would not be reduced by the shortfall between the scrap price of the cars and the SLV.

In 2001, however, Railcar's new CEO, Jim Smallwood, decided that the oral agreement from the February 2000 meeting was unenforceable and that the original Transaction documents controlled. Hence, Railcar claimed that Allfirst owed them $1.6 million, because the shortfall between the scrap value and the SLV of the 400 cars removed from the transaction in 2000 — a shortfall that Railcar had orally agreed to absorb — exhausted the FLDG and exceeded it by $1.6 million. At the same time, Defendants also stopped making regular rent payments to Allfirst.

II. PROCEDURAL HISTORY

This case began with a lawsuit filed by Progress and Railcar against Allfirst in a Georgia state court seeking, among other things, to recover the alleged $1.6 million overpayment of the FLDG limit. Allfirst removed the Georgia case to the United States District Court for the Northern District of Georgia. Allfirst then filed the instant case [MJG-01-2527] in the District of Maryland, seeking past-due MNR for each railcar, the cost of unperformed repairs, lost rents for off-lease cars that sat idle until scrapped, and the difference between the scrap price received for each car and the amount the car would have been worth had it been maintained as required by the terms of the Transaction. The Northern District of Georgia

then transferred the Georgia case to this Court, where it became MJG-01-2991. The captioned cases were consolidated for trial.[5]

After a seventeen-day bench trial, this Court found for Allfirst with regard to all claims except those for (1) missed rental opportunities for the cars sitting idle and (2) damages stemming from the disposition of the unmaintained cars for scrap value. <u>See</u> Memorandum of Decision [ECF No. 84]. On cross-appeal, the United States Court of Appeals for the Fourth Circuit essentially held for Allfirst, remanding the case for further consideration with regard to Allfirst's claims for missed rental damages and disposition damages. <u>See</u> <u>Allfirst Bank v. Progress Rail Servs. Corp.</u>, 521 F. App'x 122 (4th Cir. 2013).

III. <u>DISCUSSION</u>

Allfirst claims that it is entitled to:

    1.    An increase in the damages awarded to it by this Court for missed rental opportunities during the final twenty-eight months of the contract term;

    2.    An increase in the damages awarded by this Court for the difference between the proceeds of sale of scrapped railcars and what should have been the fair market value of those cars at the time of disposition;

---

[5] Both of the captioned cases were initially assigned to Judge Harvey of this court but thereafter transferred to the undersigned judge.

3.   Reasonable attorneys' fees; and

4.   Prejudgment interest on all awards.

A.   <u>Missed Rental Opportunities</u>

Allfirst contends that Defendants breached their contractual duty to maintain and market Allfirst's railcars for lease, resulting in missed rental opportunities and damage to Allfirst.  Further, Allfirst asserts that a market existed for the cars such that they could have been rented for at least the MNR over the final twenty-eight months of the contract term. Therefore, Allfirst claims it is entitled to damages of $2,195,045.00, representing the unpaid balance of the MNR for those final twenty-eight months.[6]

In its 2010 Memorandum of Decision [ECF No. 84] [the "Prior Decision"], the Court stated:

> [T]here is no dispute that all of the railcars were on-lease and earning rent when the transaction commenced.  Thus, at a minimum, the railcars were in running order and could hold product.  At the very least, Progress was obligated to maintain the railcars in this condition.
>
> Progress did not keep all railcars coming off lease in the requisite condition.  Thus, Allfirst may be entitled to damages caused by this breach of the agreement.

---

[6]   Allfirst acknowledges that it received some of the rent proceeds for the period after August 1, 2001, and seeks only the balance of the MNR due.  <u>See, e.g.</u>, Allfirst Bank's Memorandum in Support of Motion for Entry of Judgment as to Remanded Portion of Case [ECF No. 160-2], at 26.

> To establish a right to damages with regard
> to a failure to maintain a given railcar,
> Allfirst must establish that it suffered a
> loss due to the failure. Thus, there would
> be no damages for a failure to maintain a
> railcar if the railcar would not have been
> leased (or otherwise generated funds for
> Allfirst) had it been maintained.

Prior Decision at 20.

On appeal, the United States Court of Appeals for the

Fourth Circuit stated:

> We consider Allfirst's claim for additional
> rents to be akin to one seeking lost
> profits, and so we look to relevant Maryland
> law on that subject. To recover lost profits
> under Maryland law for breach of contract, a
> plaintiff must show that (1) the breach by
> the defendant was the proximate cause of the
> plaintiff's loss, (2) the defendant could
> reasonably foresee, when it executed the
> contract, that a loss of profits would be a
> probable result of a breach, and (3) the
> amount of lost profits can be proved with
> reasonable certainty. M & R Contractors &
> Builders v. Michael, 138 A.2d 350, 353, 355
> (Md. 1958). "Losses that are speculative,
> hypothetical, remote, or contingent either
> in eventuality or amount will not qualify as
> 'reasonably certain' and therefore
> recoverable as contract damages." Hoang v.
> Hewitt Ave. Assocs., 936 A.2d 915, 935 (Md.
> Ct. Spec. App. 2007).

Allfirst Bank v. Progress Rail Servs. Corp., 521 F. App'x 122,
129 (4th Cir. 2013).

## 1. Proximate Cause

As held in the Prior Decision, Defendants breached the

Transaction by failing to keep all railcars coming off lease in

the requisite condition.  In light of this holding in the Prior

Decision, this Court stated:

> Allfirst seeks recovery with regard to
> railcars that were not leased by Defendants
> on the theory that there was a generally
> available market for the lease of such cars
> maintained in operable condition.  Allfirst
> presented expert witness testimony regarding
> the fair rental value of the idle -off-lease
> and not earning rent- railcars in the
> Portfolio Transaction.  However, the Court
> finds the testimony inadequate to establish
> any reliable estimate of rental that could
> have been earned from hypothetical leases.
> The evidence did not establish industry
> utilization rates, average fleet
> operability, bad faith on the part of
> Defendants or any other basis for awarding
> Allfirst damages based upon theoretically
> available rental opportunities.

Prior Decision at 62.

The Court, reconsidering its finding in light of the

appellate decision, finds the expert testimony presented by

Allfirst[7] adequate to establish — to a reasonable degree of

certainty — that there would have been a market for the rental

of the railcars at issue had they been maintained as required by

the Transaction.  The appellate court stated:

> The testimony of Allfirst's experts showed
> that the railcars could have been leased had
> they been kept in serviceable condition.
> Both experts also provided a range of rents
> that each car could have earned through
> November 30, 2003, depending on several
> factors.  Other than contending that there

---

[7]  Essentially unrefuted.

> was a weak market for one type of car (which an Allfirst expert accounted for in his report), Defendants' experts provided no substantive rebuttal to Allfirst's evidence on rent damages.

Allfirst 521 F. App'x at 129.

The Court, therefore, finds that Defendants' breach of the Transaction's maintenance requirement was a proximate cause of lost rental opportunities to Allfirst.

## 2. Foreseeability

The Court finds it rather obvious that the parties must have foreseen that, in the event that Defendants failed to maintain the cars at issue in their initial condition, there would be a loss of rental income to Allfirst.

## 3. Amount of Lost Profits

As to the amount of damage caused by Defendants' breach, the appellate court stated:

> Although the court stated that the potential lease opportunities described by the experts were "hypothetical"—one of the permissible bases for finding that lost profits are not "reasonably certain"—it did not explain why this was so. Furthermore, the court provided no explanation or authority for why an award of additional rent damages needed to be supported by "industry utilization rates" or "average fleet operability," J.A. 953, terms that no party introduced, explained, or otherwise relied on at trial.

Allfirst, 521 F. App'x at 129-30.

The Court, in light of the appellate decision, does not find a valid reason to require that Allfirst establish industry utilization or average fleet operability. Moreover, the Court finds the testimony at issue adequate — in the context of the instant case — to establish the amount of damages to a reasonable degree of certainty.

Allfirst presented two expert witnesses who testified that the market would support rental of _all_ of Allfirst's cars if they were priced reasonably,[8] and that, at said reasonable prices, the rentals would collectively yield an amount in excess of the MNR during the last 28 months of the contract term. Defendants offered no expert testimony to dispute these opinions.

It must be borne in mind that Allfirst is not here claiming damages measured by the precise amount of rental that would have been received.[9] Rather, it is seeking damages based upon a finding that the total rental that would have been received would exceed the total MNR applicable to the railcars at issue.

---

[8] _See_ Hearing Tr., Oct. 21, 2013 [ECF No. 168], at 57 (Mr. Gebhardt (for Allfirst): "First of all, the two experts testified that at the rates they set, the cars would be on lease at these rates. In effect, they're testifying as to a hundred percent – if we need to use the term – utilization rate.")

[9] A determination of the precise amount may well be subject to Defendants' criticism based upon the imprecision of the expert opinions.

The Court accepts the testimony of Allfirst's expert witnesses in this regard.

In sum, the Court thus finds that Allfirst is entitled to damages for missed rental opportunities over the final twenty-eight months of the contract term in the amount of the total MNR for that period reduced by any amounts previously received. The Court presently understands that this net amount is agreed to be $2,195,045.00.[10]

B.  Disposition Damages

In the Prior Decision, the Court held that "Progress did not keep all railcars coming off lease in the requisite condition. Thus, Allfirst may be entitled to damages caused by this breach of the agreement." Prior Decision at 20. However, the Court did not award Allfirst any damages stemming from lower proceeds received for the cars due to the breach, stating:

> Allfirst claims that it is entitled to recover from Defendants the difference between the appraised fair market value of the Remaining [483 unsold] Cars and the disposition proceeds.
>
> Allfirst has introduced expert testimony estimating the fair market value of the cars, as of the close of the Portfolio Transaction, based on the premise that Defendants would maintain the cars in "interchange" and leasable condition.

---

[10]  The Court will consider a motion to adjust this amount filed by November 30, 2015, if its understanding is incorrect.

However, the estimates had been made more than a year prior to the operative date and are not accepted as sufficiently reliable to establish Allfirst's claims for damages.

Accordingly, Allfirst shall not recovery any damages with regard to its claim for the difference between the estimated fair market value of the Remaining Cars and the actual disposition proceeds.

Prior Decision at 68-69.

On appeal, the Fourth Circuit stated:

Here, Allfirst's experts provided three separate reports regarding the estimated values of the railcars, dated November 20, 1998, February 28, 2002, and March 1, 2002. Each report estimated the future value of each railcar as of November 30, 2003. Depending on car type and potential condition at sale, Allfirst's experts estimated that Allfirst could have received from $1500 to $11,000 per railcar. As with the claim for additional rent damages, Defendants presented no testimony to contradict this evidence.

We readily acknowledge the broad discretion afforded to district courts in evaluating expert testimony as to future value, but a district court cannot summarily reject such evidence simply because the timing of the trial and its scheduling deadlines prevent a party from providing the court with estimates made closer to the operative date of the contract. While the district court did say that the evidence was not sufficiently reliable, it gave no explanation for this conclusion, save for the timing of the reports. We therefore vacate the judgment of the district court as to this damage issue and remand for further consideration.

Allfirst, 521 F. App'x at 130-31 (footnotes omitted).

13

Upon reconsideration, the Court finds no valid reason to reject the opinions of Allfirst's experts that Allfirst could have received from $1,500 to $11,000 per railcar had they been maintained in the required condition.

In regard to the amount of damages, Allfirst presented testimony of each of its two experts based upon somewhat differing approaches. Defendants offered no evidence to rebut Allfirst's experts' opinions.

Mr. Savage opined that the remaining cars in the fleet would have been sold for a total of $1,767,500 while Mr. Husband opined that the remaining cars in the fleet would have been sold for a total of $ $1,872,500. The Court rejects the contention of Allfirst that it should average the two opinions. The Court also rejects Defendants' position that the Court should "lemon pick" the opinions by taking the lower of the opinions as to each separate category of cars. The Court finds it more appropriate to consider the opinions as a whole and to find the lower of the two totals as the amount proven by Allfirst.

Accordingly, finding that the fair market value of the cars at issue (i.e. what would have been obtained from their sale) would have been $1,767,500.00 and that Allfirst received proceeds totaling $1,500,030.18 when it sold these for scrap

value, the Court shall award Allfirst damages in the amount of
$267,469.82.[11]


C.    Attorneys' Fees

In the Second Memorandum of Decision Re: Remaining Issues,
[ECF No. 100], the Court held that Allfirst had a contractual
right to an award of attorneys' fees without regard to its
status as a "prevailing party" and would therefore be awarded
its reasonable attorney's fees.  The Court stated that, in
determining the amount of the award, "the Defendants' grounds
for complete non-enforcement of the relevant attorneys' fees
provision[12] may properly be asserted, and appropriately taken
into account."

The parties have agreed that the amount of the award of
attorneys' fees will be determined with the participation of a

---

[11]  In the Order [ECF No. 190], the Court stated that the
$267,469.82 finding was based on "the lower of Allfirst's two
expert opinions after correction of arithmetic errors in an
exhibit."  Reference was made to the hearing exhibit identified
at page 79 of the hearing transcript [ECF No. 191].  The exhibit
contained certain calculation errors in regard to averaging.
However, the Court understands that $1,767,500.00 is the correct
total of Mr. Savage's valuation of all of the cars.  The Court
will consider a motion to adjust this amount filed by November
30, 2015 if its understanding is incorrect.

[12]  For example, Defendants contend that Allfirst will be awarded
only a fraction of what it claimed originally it was due, that
Allfirst was found to be in breach of the agreements containing
the attorneys' fee provision, and/or that Allfirst failed to
accept generous settlement offers before trial.

Special Master.  Accordingly, it is appropriate to clarify the manner in which such grounds should be taken into account.

The Transaction provides that Allfirst is entitled to "all reasonable attorneys' fees and other costs and expenses incurred by [Allfirst] by reason of an Event of Default or the exercise of [Allfirst's] remedies hereunder."  <u>See, e.g.</u>, Second Memorandum of Decision Re: Remaining Issues [ECF No. 100], at 3 (citing Assignment Agreement, § 16).  This right is not based upon Allfirst's status as a "prevailing party" and the amount is not to be determined as if the amount of legal fees to be awarded were based upon such a status.

The Court concludes that Allfirst is entitled to the amount of legal fees that a reasonable client in Allfirst's situation would agree to pay for the legal services Allfirst received. If, and to the extent (if any) that, such a reasonable client and attorney would agree to adjust the fees due to any contentions asserted by Defendants,[13] the Special Master should adjust the amount of the fee award accordingly.

D.  <u>Prejudgment Interest</u>

The rate of prejudgment interest in Maryland is fixed at 6% per annum.  <u>Harford Cnty. v. Saks Fifth Ave. Distrib. Co.</u>, 923 A.2d 1, 14 (Md. 2007) (citing MD. CONST. art. III, § 57).

---

[13]  <u>See</u> <u>supra</u> note 12.

16

Under Maryland law, prejudgment interest is "allowable as a matter of right" when "the obligation to pay and the amount due had become certain, definite, and liquidated by a specific date prior to judgment." Buxton v. Buxton, 770 A.2d 152, 165 (Md. 2001) (citation omitted). Conversely, prejudgment interest is not permitted "in tort cases where the recovery is for bodily harm, emotional distress, or similar intangible elements of damage not easily susceptible of precise measurement." Id. Hence, it is an abuse of discretion to award prejudgment interest where the precise damages are "unpredictable and incapable of estimation prior to verdict." Id. at 166.

In between these extremes is a "broad category of contract cases in which the allowance of pre-judgment interest is within the discretion of the trier of fact." Id.

In Crystal v. W. & Callahan, Inc., 614 A.2d 560 (Md. 1992), a case within the two extremes, the Plaintiff sued for nonpayment of a bill for construction work done. The trial judge made a finding that the reasonable value of the work provided to the defendant was equal to the amount billed and exercised the discretion to award prejudgment interest. The Maryland Court of Appeals stated:

> Where a contract case is somewhere in between [the two extremes], such as this one, the question of whether to award prejudgment interest is well within the discretion of the finder of fact.

The award of prejudgment interest sustained
in Berman Properties[14] was much like this
award. There the claims arose out of related
construction contracts in which the
contractor was to be paid costs plus fixed
fees, and the owner unsuccessfully claimed
that the total, combined payments of costs
and fees had been capped. Moreover, here,
the fact that Crystal's own expert believed
that West & Callahan charged a fair price
for the work, combined with the fact that
the contractor submitted detailed bills for
time and materials, is enough to conclude
that the trial judge did not abuse his
discretion.

Crystal, 614 A.2d at 572-73 (footnote added).

## 1. Re: Missed Rental & Disposition Damages

With regard to missed rental damages and disposition
damages, the Court finds that the obligation to pay and the
amounts of recovery had become sufficiently "certain" and
"definite" prior to judgment such that prejudgment interest can
be awarded on those amounts.

The resolution of Defendants' obligation to pay MNR for the
final 28 months of the Agreement is a "binary" type (i.e., "yes"
or "no") decision — would the total rental receipts absent the
breach have exceeded the total MNR.  If so — as was found —
Allfirst was entitled to the amount fixed by contract.  It was
not necessary to determine the precise amount of rental

---

[14]  I.W. Berman Props. v. Porter Bros., 344 A.2d 65, 75 (Md.
1975).

receipts.  The amount due to Allfirst is arithmetically determined by subtracting from the total MNR for the last 28 months of the Transaction to which it was entitled, the amount, if any, previously paid Allfirst.

Allfirst's disposition damages were determined by subtracting the amount Allfirst received for the cars sold for scrap from what would have been the proceeds had the cars been maintained as required by the contract.  While necessarily dependent upon a fact-finding regarding the total fair market value of the railcars, the finding is not one of an inherently indeterminable amount analogous to those tort awards for which prejudgment interest is prohibited.

### 2.  <u>Re: Attorneys' Fees</u>

The Court would, if it could, exercise its discretion to award prejudgment interest on Allfirst's award of attorneys' fees.  However, it concludes that it cannot do so.

As has been held by other courts in similar circumstances, until the amount of the attorneys' fees award is determined, the "claim [will] remain[] unliquidated beyond the entry of judgment" such that an award of prejudgment interest would not be appropriate.  <u>Graham v. Nat'l Union Fire Ins. Co.</u>, 556 F. App'x 193, 199 (4th Cir. 2014) (denying prejudgment interest on award of attorneys' fees under West Virginia law); <u>see</u>

also <u>Fleming v. Cnty. of Kane, State of Ill.</u>, 898 F.2d 553, 565 (7th Cir. 1990) ("As we have noted, plaintiffs may collect interest on attorney's fees or costs only from the date that the award was entered. Prior to the date the judgment on attorney's fees was entered, plaintiff's attorneys' claim for unpaid attorney's fees was unliquidated and, as such, not entitled to interest.").

In the instant case, the determination of the amount of the legal fee award requires more than deciding upon the number of billable hours to recognize and the rate to charge, <u>i</u>.<u>e</u>. a "lodestar" amount and an overall adjust. Rather, in the instant case, the legal fee award is dependent upon the determination of what a reasonable client would agree to pay a reasonable attorney in light of all relevant factors. Thus, the determination of the legal fee award is — in the context of this case — more analogous to the determination of a tort recovery than to the determination of a right to recovery of an amount derived arithmetically from a contract right.

Therefore, the Court concludes that, although it would exercise its discretion to award Allfirst prejudgment interest if it could, it lacks the authority to do so.

### 3. Prejudgment Interest Date

The Court finds it appropriate, in the context of the instant case, to provide for the accrual of prejudgment interest from November 30, 2003, the date of the end of the Transaction.

## IV. CONCLUSION

For the foregoing reasons:

1. Plaintiff's Motion for Entry of Judgment [ECF No. 160] is GRANTED.

2. Plaintiff's Motion for an Award of Prejudgment Interest on Attorneys' Fees [ECF No. 183] is DENIED.

3. Prejudgment interest, as determined herein, shall accrue at the rate of 6% (simple) per annum from November 30, 2003.

4. The parties shall proceed to determine the amount of legal fees to award Allfirst with the participation of a Special Master pursuant to their agreement in this regard.

5. Unless any party suggests a different procedure by November 30, 2015, the Court shell issue a Supplemental Judgment after resolution of any motions that may be filed pursuant to footnotes 10 and 11 hereof.

SO ORDERED, on Tuesday, November 3, 2015.

_____/s/_____
Marvin J. Garbis
United States District Judge

21